UNITED STATES of America,
Plaintiff-Appellee,

v.

Clifford Jerome MILLER,
Defendant-Appellant.

UNITED STATES of America,
Plaintiff-Appellee,

v.

Kathelyn Vandraiss MILLER,
Defendant-Appellant.

UNITED STATES of America,
Plaintiff-Appellee,

v.

Clifford Jerome MILLER,
Defendant-Appellant.

Nos. 80–2226, 80–2230 and 81–1090.

United States Court of Appeals,
Fifth Circuit.

Feb. 4, 1982.
Rehearings and Rehearings En Banc
Denied March 2, 1982.
Certiorari Denied May 3, 1982.
See 102 S.Ct. 2043, 2044.

Robert Ramos, Asst. Federal Public Defender, El Paso, Tex., for defendant-appellant in Nos. 80–2226 and 81–1090.

Sidney Powell, Asst. U. S. Atty., San Antonio, Tex., Janis H. Kockritz, Atty., Dept. of Justice, Washington, D. C., for plaintiff-appellee in all cases.

Raymond C. Caballero, court-appointed, Evelina Ortega, El Paso, Tex., for defendant-appellant in No. 80–2230.

Before THORNBERRY, TATE and WILLIAMS, Circuit Judges.

THORNBERRY, Circuit Judge:

Appellants Clifford and Kathelyn Miller were convicted of mail fraud, under 18 U.S.C. § 1341, and for conspiring to defraud the United States by filing a false social security claim in violation of 18 U.S.C. § 286. Clifford Miller also was convicted of possessing a firearm in violation of 18 U.S.C., § 1202(a) Appendix. Appellants were tried separately, but their cases are consolidated for this direct appeal since they raise the same central issue.

They claim that most of the evidence admitted against them at trial was discovered by the government only because it had access to Clifford's diary, which this court held to be inadmissible in *United States v. Miller*, 608 F.2d 1089, 1093–96 (5th Cir. 1979), *cert. denied*, 447 U.S. 926, 100 S.Ct. 3020, 65 L.Ed.2d 1119 (1980). The prosecution, they argue, failed to establish that the evidence it offered fell within any exception to the general exclusionary rule. Clifford Miller also contends that the trial court

erroneously denied him two challenges for cause. Kathelyn argues that Clifford's confession was admitted against her in violation of *Bruton v. United States*, 391 U.S. 123, 88 S.Ct. 1620, 20 L.Ed.2d 476 (1968).

## I. Jurisdiction

Before we reach the substantive issues in this case, we must dispose of a jurisdictional problem presented only by Clifford Miller's appeal. His notice of appeal was stamped February 17, 1981, a date past the Rule 4(b) deadline mandated by the Federal Rules of Appellate Procedure. Normally, this would preclude our jurisdiction, but appellant claims that he filed his notice on February 12, which was timely under the rule.

The mistake occurred, according to appellant's affidavit from the Clerk of the District Court, El Paso Division, because the clerk failed to stamp the notice before she forwarded it to the Pecos Division. February 17 apparently is the date upon which Pecos officials received the notice. The government does not deny appellant's explanation for the untimely stamp.

The Supreme Court has held that the "Clerk's receipt of the notice of appeal within the 30-day period" satisfies the filing requirements, for civil appeals, even if the notice is not actually "stamped" or "filed" until after the deadline. *J. Parissi v. Telechron, Inc.*, 349 U.S. 46, 75 S.Ct. 577, 99 L.Ed. 867 (1955). We find this reasoning equally applicable to appeals under Rule 4(b). When appellant offers the district clerk's uncontroverted affidavit that she received the notice before the deadline expired, and the government has not demonstrated that notice was not received on that day, this court should not find that appellant's notice of appeal is untimely. *Da'Ville v. Wise*, 470 F.2d 1364, 1365 (5th Cir.), *cert. denied*, 414 U.S. 818, 94 S.Ct. 40, 38 L.Ed.2d 50 (1973); *Ward v. Atlantic Coast Line Railroad*, 265 F.2d 75, 79–80 (5th Cir. 1959), *rev'd on other grounds*, 362 U.S. 396, 80 S.Ct. 789, 4 L.Ed.2d 820 (1960). We, there-

fore, conclude that this court may properly exercise jurisdiction.[1]

## II. Background of Evidentiary Claim

This court's prior decision in *Miller* considered the admissibility of evidence obtained pursuant to a search of appellants' car on the night of November 18, 1977. Appellants were stopped by officers Greer and Maxwell of the Texas Department of Public Safety (DPS) at a routine license and vehicle registration checkpoint adjacent to a border patrol checkpoint outside of Marfa, Texas. The diary, which was discovered during the search, narrated appellants' elaborate fraud insurance scheme. Since the details of both the search and the fraudulent conduct are set out fully in our previous decision, *see Miller, supra*, 608 F.2d at 1093–95, 1104–05, we will limit our attention here to what was deemed admissible in that case. It is the holding of our prior decision, after all, which defines the "poisonous tree" that is the basis of these appeals.

Finding it reasonable for officer Maxwell to move the Millers' car off the road, this court held the pistol admissible since it was in plain view of the officer. *Id.* at 1099. The rifle found in the back seat was also admissible because Clifford volunteered its location and gave permission for the officers to run an NCIC check on it. Because the diary was held inadmissible, none of those involved in its seizure were allowed to testify as to Miller's true identity under the "fruit of the poisonous tree" doctrine, though they could testify about the arrest and identify him in court as the person arrested. *Id.* at 1101. The government was allowed to prove Clifford's identity by any evidence unconnected with the search of the portfolio and the examination of the diary.

Most importantly, this court held Clifford's confession to Inspector Clemmons,

eight days after the discovery of the diary, admissible under *Brown v. Illinois*, 422 U.S. 590, 599, 95 S.Ct. 2254, 2259, 45 L.Ed.2d 416 (1975): "The record establishes that Miller's statement to Clemmons was an intervening act of free will which purged any taint accruing from the original seizure and perusal of the diary." *Miller, supra*, 608 F.2d at 1103. Thus, investigating officers had access to a statement that contained, in substance, the same incriminating information discovered by Maxwell in the diary. *See id.* at 1104–05 Appendix, for text of Clifford's statement. This court rejected appellants' argument that Clifford only confessed because the diary had been found —"cases of this type are not to be decided on a *per se* 'but for' rationale." *Id.*

## III. Was the Testimony Tainted Fruit of the Poisonous Tree?

■ A. *The testimony of Officers Greer and Maxwell*—Appellants object to the testimony of Greer and Maxwell regarding the circumstances of the arrest and their identification of Clifford Miller as the person arrested. Their complaint completely ignores a specific holding in our previous decision, which allows those persons involved in the seizure of the diary to testify about the details of the arrest and to identify Miller in court as the person arrested. *Miller, supra*, 608 F.2d at 1101. The testimony of Greer and Maxwell did no more than comply with this court's ruling, and therefore, it was properly admitted.

■ B. *The testimony of Postal Inspector Clemmons*—Inspector Clemmons did not see the diary or know of its existence, though he was aware of the facts gathered from its use. He interviewed Clifford Miller eight days after the search and obtained from him a signed statement, which indicated that the statement was voluntary and given with full knowledge of Miller's consti-

1. In *Ward, supra*, the district clerk was on vacation, and though notice was received on time, it was not stamped till after expiration of the appeal deadline. 265 F.2d at 79–80. The court held nevertheless that the appeal was timely. Other circuits have approved the ra-

tionale of *Ward* and *Da'Ville*. *See Aldabe v. Aldabe*, 616 F.2d 1089, 1091 (9th Cir. 1980); *In Re Piper Aircraft Dist. Sys. Antitrust Lit.*, 551 F.2d 213, 216 n.7 (8th Cir. 1977); *United States v. Solly*, 545 F.2d 874, 876 (3rd Cir. 1976).

tutional rights. At trial, Inspector Clemmons related what Miller had described to him about Miller's fake death in Mexico, his subsequent insurance scam, and his wife's participation. As noted already, this court has held the statement to Inspector Clemmons admissible as "an intervening act of free will" that purged any taint accruing from the original seizure of the diary. *Id.* at 1103. Since the inspector's testimony is based on Miller's confession, and not on the diary, it would be inconsistent for this court to exclude Clemmons' testimony as a fruit of the tainted diary.

C. *The testimony of other witnesses connected with the fraudulent scheme* —Several witnesses for the government were contacted after the scam became known to the police.[2] Appellants argue that investigators could not have discovered these witnesses without exploiting the diary.

In asking whether the evidence falls within the general exclusionary bar against use of the fruits of an unlawful search, our inquiry must focus on whether the testimony " 'has been come at by exploitation of that illegality or instead by means sufficiently distinguishable to be purged of the primary taint.' " *Wong Sun v. United States,* 371 U.S. 471, 487–88, 83 S.Ct. 407, 417, 9 L.Ed.2d 441 (1963). Whether evidence is sufficiently distinguishable hinges on the application of three closely related exceptions to the exclusionary rule. The testimony will be admissible if it derives from an independent source, *Silverthorne Lumber Co. v. United States,* 251 U.S. 385, 392, 40 S.Ct. 182, 183, 64 L.Ed. 319 (1920); *Passman v. Blackburn,* 652 F.2d 559, 565 (5th Cir. 1981), or if it has an attenuated link to the illegally secured evidence, *United States v. Ceccolini,* 435 U.S. 268, 98 S.Ct. 1054, 55 L.Ed.2d 268 (1978); *Nardone v. United States,* 308 U.S. 338, 341, 60 S.Ct. 266, 267, 84 L.Ed. 307 (1939), or if it inevitably would have been discovered during police investigation without the aid of the illegally obtained evidence, *Brewer v. Williams,* 430 U.S. 387, 406 n.12, 97 S.Ct. 1232, 1243 n.12, 51 L.Ed.2d 424 (1977); *United States v. Brookins,* 614 F.2d 1037, 1044 (5th Cir. 1980). Without addressing the question of whether the leads to these witnesses came from an independent evidentiary source,[3] we hold that their testimony is admissible both under the attenuation exception and because Clifford Miller's confession made their discovery inevitable.[4]

2. Clifford objects to the following witnesses: Earl McLaughlin, an employee of the Social Security Administration, Jerry Franklin, vice-president of Franklin National Bank where Kathelyn Miller cashed her checks from Standard Insurance, Dennis McFarland, an employee of Standard Insurance, Albert F. Kreitsick and William E. Robinson, who are both employed by Mutual of New York Insurance Company, and Wayne Taylor, an investigating officer who also obtained a confession from Clifford Miller. Kathelyn objects to the testimony of Greer, Maxwell, Robinson, Franklin, McLaughlin, Joe McNulty, an attorney for Standard Insurance, and John Dougherty, an employee of Mutual.

Since these witnesses are connected to the diary in substantially the same way, we will consider their testimony as a whole with two exceptions: Robinson and Taylor. We note here that the *prosecution obtained the testimony of William Robinson because of a chance conversation between Officer Maxwell and Robinson on the eve of trial. The diary, therefore, did not "lead" to Robinson's testimony. Robinson, a former welfare officer, was able to identify Clifford Miller based on his contact with Miller in the years prior to his "death."

This court has held that Miller's identity could be proved from sources unconnected with the search of the diary. *Miller, supra,* 608 F.2d at 1101. Thus, Robinson's testimony was proper. Wayne Taylor obtained a statement from Clifford after Clifford had confessed to Inspector Clemmons. While Taylor's testimony seems clearly based on the diary, it is so similar to Clemmons' testimony that it is merely cumulative and, therefore, harmless. Even if it was erroneously admitted, then, its admission is not reversible error.

3. We do not address the independent source argument because the government admits, at least in the case of Clifford Miller, that the leads to the witnesses were developed in fact from information found in the diary.

4. Since this court previously has refused to treat the logical connection between Clifford's statement to Inspector Clemmons and the seizure of the diary as undeniable, this panel is precluded from reconsidering that issue, and contrary to appellants' request, we decline to comment on the correctness of the prior opinion.

*United States v. Ceccolini, supra,* provides the most helpful analysis for judging attenuation. In *Ceccolini,* a police officer improperly discovered some gambling slips inside an envelope after he had entered the defendant's shop to visit Hennessey, an employee. Hennessey later testified against Ceccolini in his trial for perjury. Ceccolini moved to suppress Hennessey's testimony as the fruit of the illegal search of the envelope. Although the logical connection between the illegal discovery and Hennessey's testimony was undisputed, the Supreme Court refused to adopt a *per se* rule, emphasizing the difference between live testimony and physical evidence. 435 U.S. 275–76, 98 S.Ct. at 1059. The Court applied a test for admissibility that assessed the degree of free will exercised by the witness, *id.* at 276, 98 S.Ct. at 1060, and balanced the social cost of exclusion against the efficacy of exclusion in deterring illegal police conduct, *id.* at 275, 277, 98 S.Ct. 1060, 1061.

■ Applying this test to the case at hand, it seems clear that all of these witnesses would have come forward to testify if they had known of the fraud. It was to their advantage to testify since they were representatives of organizations that were either direct victims or unknowing facilitators of appellant's fraud. There is no evidence that investigators used the diary itself in questioning the witnesses, or that the witnesses even knew of its existence. *See id.* at 279, 98 S.Ct. at 1062.

Balancing the social cost of exclusion against any deterrence to be gained, we admit that exclusion of the testimony possibly would encourage law enforcement officers to procure a warrant before intruding into an object as private as a person's diary. And, unlike the officer who found the gambling slips in *Ceccolini,* the officers here must have intended to find something incriminating when they opened the portfolio and read the diary since they knew Clifford was lying about his name and since they knew the rifle was stolen. *Cf. Ceccolini, supra,* 435 U.S. at 279, 98 S.Ct. at 1062. Nevertheless, the social cost is great when we consider that the police have legitimate

access to a statement that contains the same information as the diary.

The penalties visited upon the government must "bear some relation to the purposes which the law is to serve." *Id.* It would be anomolous for this court to admit Miller's confession, finding that its exclusion would have no deterrent effect, and then bar the use of live, voluntary testimony obtained perhaps months after the search and the confession and having, in some instances, no direct relationship to either the diary or those who knew of its existence. *See Brookins, supra,* 614 F.2d at 1042–43; *United States v. Marder,* 474 F.2d 1192, 1196 n.5 (5th Cir. 1973). We conclude that the balance between the social cost of exclusion and its potential deterrent effect is struck in favor of allowing the testimony. The testimony, therefore, is sufficiently attenuated from the illegal search of the diary to be admissible.

We also hold that the testimony is admissible under the inevitable discovery exception to the exclusionary rule. The availability of Clifford's confession makes this exception the most appropriate doctrine to apply to these facts. The Supreme Court recognized the inevitable discovery exception in *Brewer v. Williams, supra,* 430 U.S. at 406 n.12, 97 S.Ct. at 1243. The police in *Brewer* had violated the right to counsel of an accused murderer by eliciting incriminating statements and by convincing him to admit the location of the victim's body after he had terminated the interrogation until he reached his lawyer. While the Court sustained exclusion of the incriminating statements, it stated that the admission of the location and condition of the body might be proper "on the theory that the body would have been discovered in any event, even had incriminating statements not been elicited." *Id.*

Approving the inevitable discovery exception in *United States v. Brookins, supra,* this court apparently limited its application, at least on the facts of that case, by requiring two factors in addition to a "reasonable probability" that the evidence would have been discovered from other than a tainted

source. 614 F.2d at 1042 n.2. The court demanded first, a showing by the prosecutor that the leads, which made discovery inevitable, were possessed by the police prior to the occurrence of the illegal police conduct, and second, that the evidence in question be the voluntary testimony of a witness as it is here. *Id.* After a lengthy discussion of the development of this exception, 614 F.2d at 1044–48, the court found that the prosecution had satisfied the exception and admitted the testimony. *Id.* at 1049. *Brookins* is distinguishable from this case because the court did not have before it a subsequent intervening occurrence, like Clifford's confession, which provided an independent legal source for the disputed evidence. For this reason, it makes little sense to adhere rigidly to the first requirement of *Brookins*—that the leads be in police possession prior to the illegal conduct.[5]

*United States v. Fitzharris*, 633 F.2d 416 (5th Cir. 1980), *cert. denied*, —— U.S. ——, 101 S.Ct. 2325, 68 L.Ed.2d 847 (1981), is more analogous to the facts here than *Brookins*. In *Fitzharris*, the court considered the admissibility of marijuana that was first observed during an illegal search of the defendants' ranch. DEA agents later returned with a search warrant and seized the marijuana. The court held that the initial entry onto the ranch did not taint the subsequent seizure of the marijuana: "So long as the warrant was valid and secured without reference to the events uncovered during the warrantless arrests, and so long as the police would have discovered the marijuana in any event, the fact that they saw it during a presumably illegal search did not require its suppression." 633 F.2d at 421. Appellants' circumstance is similar because the witnesses who were discovered by following leads in the diary "would have been discovered in any event" had the police relied solely on Clifford Miller's statement to Inspector Clemmons.

*United States v. DeSimone*, 660 F.2d 532 (5th Cir. 1981), and *United States v. Rowell*, 612 F.2d 1176 (7th Cir. 1980) (explicitly approved in *DeSimone*) are equally helpful. In these cases, the defendants protested the use of fingerprint exemplars obtained after an illegal state arrest. The courts for both circuits held that the prior illegality did not bar use of the fingerprints at a later trial because the federal government legitimately could have required the defendant to give his fingerprints prior to trial: "The allegedly illegal state arrest was thus not a 'but for' cause of the introduction of the fingerprint comparison, and therefore, the fingerprint comparison [from the illegal state arrest] was properly admitted." *DeSimone, supra*, 660 F.2d at 542, *quoting, Rowell, supra*, 612 F.2d at 1179. The court in *Rowell* admitted that under such circumstances "it would be useless to require the government to retake the defendant's fingerprints." *Id.*

Where the police have access to two sources containing the same information, and one is tainted while the other is lawful, it would be absurd for this court not to find that the testimony produced at trial, which stemmed indirectly from the tainted source, was inevitably discoverable apart from reliance on the unlawful source. In short, we hold the testimony admissible under two exceptions to the exclusionary rule: first, it was sufficiently attenuated from the seizure of the diary to be free from taint; and second, investigators certainly could have discovered substantially the same evidence even if they had not had access to the diary.

## IV. Did the Admission of the Confession Against Kathelyn Violate *Bruton*?

Appellant Kathelyn Miller claims that the trial court erred in allowing Inspector Clemmons to testify at trial about the statement he obtained from Clifford because it violated her Sixth Amendment

---

5. The only "lead" that possibly could satisfy the first requirement of *Brookins* is the lawful arrest of Clifford Miller, which could have led to the discovery of his true identity and his fraudulent conduct. Since his arrest and the seizure of the diary were contemporaneous, however, we cannot treat his arrest as a lead possessed by the police prior to the illegal seizure of the diary. What makes the discovery of trial testimony "inevitable," in this case, is not the arrest, but Clifford's confession.

right to confrontation as interpreted by the Supreme Court in *Bruton v. United States,* 391 U.S. 123, 88 S.Ct. 1620, 20 L.Ed.2d 476 (1969).[6] Since appellant failed to object at trial to the admission of this testimony, her conviction may be reversed on this ground only if its admission into evidence constitutes plain error. Though plain error is an elusive concept, we have no difficulty in holding that the admission of Clemmons' testimony was not a mistake so prejudicial and substantial that it rendered justice an impossibility. *See United States v. Johnson,* 585 F.2d 119, 127 (5th Cir. 1978).

The cases relied on by appellant do not support her position. In *United States v. Morales,* 477 F.2d 1309 (5th Cir. 1973), the court found plain error, but noted that its decision would be different in a case where more evidence of guilt existed and where the incriminatory implication of the confession is weaker. *Id.* at 1316 n.19. Where the confession in *Morales* was the primary piece of evidence against the defendant, the evidence inculpating Kathelyn Miller in this case is strong even without referring to Clemmons' testimony. Representatives of Standard Insurance and Mutual of New York described how appellant submitted claims for insurance benefits. A Social Security claims representative documented appellant's submission of the false Mexican death certificate to support her claim for benefits. The officers who searched appellants' car testified that Kathelyn falsely identified her husband as "Joseph Rosenfeld." She also stated that she had recently lost her husband and had known "Rosenfeld" for six to eight months. From this evidence a jury reasonably could infer Kathelyn's knowledge of the fraud and her participation in it.

More importantly, however, even if we assume that Clifford's statement was a critical part of the government's case, the jury nevertheless could have construed it favorably to the defense. Clifford stated that appellant was unaware that he had faked his death in Mexico and that she continued to believe he was dead for two or three months after she returned to the United States. Clifford also stated that he told his wife she could either file the insurance forms "or he would appear sometime during the night and pick up the children and take them back to Mexico." *Miller, supra,* 608 F.2d at 1105 Appendix. This part of Clifford's statement aided appellant because it allowed the jury to imply that she was coerced into the fraudulent scheme by her husband's threats. Appellant, in fact, argued this inference before the jury. When we consider that the jury could interpret Clifford's statement as providing some excuse for appellant's behavior, the failure of her attorney to object looks like a tactical decision that backfired. We cannot say this decision was wrong in light of the other evidence against appellant, *see United States v. Habel,* 613 F.2d 1321, 1327–28 (5th Cir.), *cert. denied,* 447 U.S. 925, 100 S.Ct. 3018, 65 L.Ed.2d 1117 (1980), and in view of the ease with which the trial court could have remedied the objection had it been presented below. We, therefore, hold that the admission of Inspector Clemmons' testimony was not plain error, if it was error at all.[7]

---

**6.** Appellant raised this issue for the first time during oral argument. Rule 28(a) of the Federal Rules of Appellate Procedure has been interpreted to require all issues to be set out in brief, and the failure to comply will result in waiver of the issue. E.g., *Bray v. Director, Office of Worker's Compensation,* 664 F.2d 1045, 1048 (5th Cir. 1981); *United States v. White,* 454 F.2d 435 (7th Cir. 1971), *cert. denied,* 406 U.S. 962, 92 S.Ct. 2070, 32 L.Ed.2d 350 (1972). Courts will suspend operation of this rule only in rare circumstances to avoid manifest injustice. *United States v. Gray,* 626 F.2d 494, 497 (5th Cir. 1980), *cert. denied sub nom,* 449 U.S. 1091, 101 S.Ct. 887, 66 L.Ed.2d

820 (1981). We decline to decide whether appellant has shown good cause sufficient to prevent waiver because the government has not addressed this issue in its brief, even though both sides were allowed to file conditional supplemental briefs on the issue raised. Moreover, since there is no merit to appellant's argument, any decision on whether waiver is present would not affect the outcome of the case.

**7.** The Supreme Court noted in *Parker v. Randolph,* 442 U.S. 62, 75 n.7, 99 S.Ct. 2132, 2140 n.7, 60 L.Ed.2d 713 (1979), that *Bruton* was tied to the situation in which it arose: " 'where the

**V. Did the Trial Court Abuse Its Discretion in Refusing to Strike Two Jurors?**

The final point of error raised in these consolidated appeals concerns the failure of the trial court to grant two challenges for cause made by Clifford Miller. Since appellant was tried after his wife, he was concerned that the publicity surrounding her trial would infect the partiality of jurors in his trial. Thus, he asked the court to question seventeen members of the jury panel individually. The court complied. After questioning, appellant sought to strike nine jurors for cause. The court granted four of these challenges. Of the remaining five jurors, appellant struck four by exercising his peremptory challenges. Thus, only one objectionable juror actually served on the jury, and appellant does not object to the refusal to strike that juror on this appeal. He objects to the trial court's refusal to strike for cause two jurors who did not serve on the jury.

A reviewing court cannot disturb the decision of the trial court on the impartiality of a juror absent an abuse of discretion. *United States v. Salinas*, 654 F.2d 319, 328 (5th Cir. 1981). Appellant argues that Ms. Arrieta and Ms. Chavez could not put aside what they had learned about this case from the newspapers and their relatives after Kathelyn's trial. Appellant essentially doubts the ability of any human being to forget what has been learned—he seeks assurance against bias that is impossible to guarantee. *See United States v. Stratton*, 649 F.2d 1066, 1081 (5th Cir. 1981). The record shows that both jurors understood the problem—that they had heard reports which could not be considered in evidence—and that they believed they could put their knowledge of the case aside and render an impartial decision. They reiterated this belief several times. Under these circumstances, we find no abuse of discretion. *See United States v. Jimenez-Diaz*, 659 F.2d 562, 568 (5th Cir. 1981); *United*

*States v. Nell*, 526 F.2d 1223, 1230 (5th Cir. 1976).

For the foregoing reasons, we affirm appellants' convictions.

**AFFIRMED.**

---

powerfully incriminating extra-judicial statements of a co-defendant, who stands accused side-by-side with the defendant, are deliberately spread before the jury in a joint trial.' " *Id.*,

quoting, *Bruton, supra*, 391 U.S. at 135–36, 88 S.Ct. at 1628. We similarly note that the statement here was neither "powerfully incriminating," nor was it offered in a joint trial.