UNITED STATES of America,
Plaintiff-Appellee,

v.

David Israel NAMER,
Defendant-Appellant.

No. 87-3128.

United States Court of Appeals,
Fifth Circuit.

Jan. 4, 1988.

John R. Martzell, New Orleans, La., for defendant-appellant.

Robert Boitmann, Curtis Collier, Asst. U.S. Attys., John P. Volz, U.S. Atty., New Orleans, La., for plaintiff-appellee.

Before GOLDBERG, POLITZ, and JOLLY, Circuit Judges.

POLITZ, Circuit Judge:

This case has been tried twice and appealed twice. The first trial concluded in convictions which the trial court set aside because of improper closing arguments by the prosecutor. In the second trial, David Israel Namer was convicted of conspiracy, 18 U.S.C. § 371, and three substantive counts in violation of 18 U.S.C. §§ 2, 1343, and 2314. On his first appeal Namer challenged, *inter alia*, the trial court's refusal to suppress certain evidence seized during execution of a state search warrant.

Upholding the challenge, we concluded that the affidavit upon which the warrant was based contained a "crucially material ... misrepresentation [which] was made, at the least, with reckless disregard for the truth." *United States v. Namer*, 680 F.2d

1088, 1094 (5th Cir.1982). We found the search warrant faulty for lack of probable cause to support its issuance and remanded for a hearing and findings on the doctrines of independent source, attenuation, inevitable discovery, and harmless error. *Id.* at 1090.

On remand the district court conducted an evidentiary hearing, found all four doctrines applicable and denied the motion for a new trial. Namer appeals. We are bound to accept the factual findings of the district court, unless we deem them clearly erroneous. Based on those findings, for the reasons assigned, we affirm.

### Background

Many of the essential facts are set forth in our prior opinion. 680 F.2d 1088–91. We note additional facts, some developed on remand, and underscore those most critical to today's decision.

Namer, doing business as Financial Management Services, Inc., offered to secure loan commitments for the permanent financing of various building projects. Typically, such capital projects require interim, short-term financing during construction, followed by permanent, long-term financing upon completion of construction. The commitment of a permanent financier is a threshold requirement for the usual interim financing agreement.

In a typical scenario, a party wishing to build or develop would engage the services of a loan broker to obtain a commitment for permanent financing from a lending institution. For a fee, the broker would prepare and submit the necessary application, with its myriad attachments. Namer's practice required advance payment of the broker's fee, subject to a refund if a commitment was not obtained. Armed with the standby or permanent commitment, the investor-developer could approach short-term lenders and request the funds needed for land acquisition and construction.

Three such transactions are involved in the instant convictions. The first relates to a standby commitment to Tropic Sales and Development, acting through Richard Gazie and Terry Ziegler, for a real estate project in Florida. The second involved a commitment to Astro Bowling Center, represented by Louis LaDuke, for a bowling alley project in Texas. The third transaction related to a proposed drydock facility in Louisiana, involving Gilmar Marine and its parent corporation, Gilco, represented by Raymond Smego and Anthony Fiasco.

Namer secured commitments for Tropic Sales and Gilmar, and attempted to get a commitment for Astro Bowling from Sinton Service Corporation, a wholly-owned subsidiary and service arm of Sinton Savings Association, a Texas savings and loan institution. In the relevant instances Sinton Service was represented by Jerry Simmons, a vice-president, who was directly accountable to the president of Sinton Savings, Robert Cartwright.[1]

When Namer was getting the two commitments and working on the third, Sinton Service was insolvent, incapable of funding the commitments, and under instructions from state banking authorities to refrain from issuing commitments.

The conspiracy count charged Namer and Simmons with conspiring to defraud investors by causing them to pay fees for worthless commitments. Each of the three transactions spawned substantive counts, involving either use of the mails, 18 U.S.C. § 1343, or inducement of interstate travel, 18 U.S.C. § 2314. Namer was convicted of the conspiracy count, two interstate travel counts regarding the Smego and Fiasco transactions, and one wire fraud count respecting the LaDuke transaction. He was acquitted of an interstate travel count involving LaDuke, and a wire fraud and interstate travel count relating to transactions with Gazie and Ziegler.

It is significant to note that all of the convictions were based on events occurring after August 2, 1977, the date Gazie in-

---

1. Cartwright was convicted of fraudulent activities involving Sinton Service. *United States v.*

*Cartwright,* 632 F.2d 1290 (5th Cir.1980).

formed Namer of Sinton's insolvency. The acquittals related to events occurring prior to that date.

Namer's activities drew the attention of the Orleans Parish District Attorney's office in late 1976 when it received the first of four complaints against him. LaDuke complained on November 3, 1977. The Orleans Parish District Attorney secured a search warrant for Namer's records and caused it to be executed. On the earlier appeal we found that warrant constitutionally infirm. Namer complains specifically of three items of evidence gathered during that illegal search and resultant testimony:

(1) two letters linking Namer with Sinton Service which referenced LaDuke;

(2) a loan commitment form for Tropic Sales from Jerry Simmons; and

(3) the testimony of Ziegler and Gazie.

Namer contends that since the documentary evidence was tainted by the unconstitutional search and seizure, everything derived from that tainted source should be excluded from evidence. The obvious critical fruit is the testimony of Gazie and Ziegler about the August 2 telephone call which, Namer insists, derived directly from leads gathered in the faulty search.

To place Namer's challenges in perspective we must attempt a sequential unfolding of the criminal investigations, either explicit or implicit in the trial court's findings or else not seriously questioned in the trial evidence.

The state investigation proceeded under the guidance of Pauline Hardin, then a state assistant district attorney. When she became an assistant United States Attorney a federal investigation was commenced. The records compiled by the Orleans Parish District Attorney, including the paperwork seized in the illegal search, were subpoenaed to the federal grand jury. Notably, the original four complaints about Namer, all predating the seizure, were numbered amongst those records.

Evidence reflects that in 1977 the FBI in Dallas was investigating Simmons, Cartwright, and Sinton Service. A Dallas FBI agent uncovered a commitment to Gilmar Marine, and on February 10, 1978 he sent a lead to the New Orleans FBI office for the interview of William O. Clay, Gilmar's representative in Baton Rouge. This Dallas FBI agent had no knowledge of the state search or of its product. Four days later Clay was interviewed and he connected Gilmar to Sinton and Namer. At this point, the agent became aware of the pending fraud investigation of Namer. Simultaneously with the interview of Clay, and pursuant to the Dallas lead, the Pittsburgh FBI office was alerted; it informed New Orleans of the information that Gilmar's attorney had furnished that office. The Pittsburgh office had no knowledge of the state search when it was contacted by Gilmar's attorney.

On March 3, 1978, Kim Peterson, an FBI informant in Houston, contacted FBI agent Rollen Powell in New Orleans and connected Namer, LaDuke, Simmons, and Sinton. LaDuke was invited to the United States Attorney's office and was interviewed on March 9, 1978. At that time LaDuke furnished a letter from Namer and a cancelled check which LaDuke had given Namer for the fee. The check reflected the name of Namer's bank. On that same day the United States Attorney subpoenaed Namer's bank records referring specifically to items connected with the parties who had complained to the district attorney. Although no reference was made to Tropic Sales, the subpoena requested all data on Namer's account between April and December 1977.

Upon receipt, the FBI did a workup of the bank records. Agent Powell then made a four-page redaction which listed more than two-score suspect transactions. Included were a $22,000 wire transfer from Tropic Sales to Financial Management Services dated July 1, 1977, and a $14,200 wire transfer a few days later from Financial Management to the account of Sinton Service, referencing a Tropic Sales commitment.

After sorting out this information, on June 9, 1978 agent Powell "set" a lead to his Miami counterparts suggesting a contact with Tropic Sales. On June 15, 1978 an interview of Gazie and Ziegler produced a copy of the Sinton commitment and infor-

mation about communications with Namer, particularly about a telephone call on August 2, in which Gazie told Namer of Sinton's insolvency.

### District Court Findings

The district court found five units of evidence derived from sources independent of the information gathered in the tainted search. All testimony and documentation relating to Gilmar Marine was found to be the product of the complaint by Gilmar's attorney to the FBI in Pittsburgh; alternatively, it derived from the lead from the Dallas agent to the New Orleans FBI which came before the search. A trace of Gilmar's payment to Namer would have disclosed Namer's bank account.

The court also found that information and documentation from LaDuke and his attorneys were the direct result of LaDuke's complaint to the district attorney, made before the search, and his subsequent interviews with the FBI and United States Attorney.

The court further found that information reflecting the involvement of Simmons and Namer came from the ongoing independent Texas investigation. In addition to the lead to Clay, there was Peterson's advisory to Powell, all completely independent of the state search data.

Finally, and of paramount importance, the court found that Namer's bank records, which were uncovered by the grand jury subpoena, came from an independent source.

Having made these findings, the court further found that the challenged Simmons/Namer correspondence referencing LaDuke was merely duplicative of untainted material and was therefore harmless. The court found that the testimony of Gazie, Ziegler, and Simmons fell under the reach of the inevitable discovery and attenuation exceptions. The most intensely disputed issue is whether the Gazie and Ziegler testimony, obviously vital to the convictions when one views the dates behind the convictions and acquittals, comes within the inevitable discovery exception. The trial court so found and concluded. We are persuaded that the factual findings pass appellate muster. From that linchpin, we find that the trial court's legal conclusions are correct.

### Analysis

■ It is not an overstatement to say that the government's case rests on the subpoenaed bank records. That the name of Namer's bank came from an untainted, independent source—LaDuke—is not contested. Rather, Namer contends that because of the tainted information the FBI focused on Tropic Sales and ferreted out the damning evidence of Gazie and Ziegler. The trial court found otherwise. The record contains sufficient evidence to support that finding.

As above noted, agent Powell set the Tropic Sales lead to Miami. He testified about that matter twice: first at a 1980 suppression hearing involving a different defendant on a non-related issue, and again in 1987 pursuant to our remand. A close reading of his testimony reflects adequate support for the finding that he routinely set the Tropic Sales lead along with several others after analyzing the bank records. Powell testified that he did not use the tainted Tropic Sales commitment in setting the Miami lead. His testimony is corroborated by the text of the teletype lead which advised "victim identified by money transfer wire certificate from . . . Tropic Sales."

■ Evidence that is the fruit of unlawful government conduct is subject to suppression, *Silverthorne Lumber Company v. United States*, 251 U.S. 385, 40 S.Ct. 182, 64 L.Ed. 319 (1920), as is evidence resulting from exploitation of the tainted source, *Wong Sun v. United States*, 371 U.S. 471, 83 S.Ct. 407, 9 L.Ed.2d 441 (1963). The rationale is that the constable is not to be placed in a better position by virtue of his illegal conduct. The core inquiry is whether the police would have discovered the evidence if the misconduct had not occurred.

This inquiry trifurcates into closely-related exceptions to the exclusionary rule: (1) independent source, *Silverthorne Lumber;*

(2) attenuation, *Wong Sun;* and (3) inevitable discovery, *Nix v. Williams.* The *Silverthorne* court taught that if facts were gathered from a tainted source as well as from a discrete, clean source, "they may be proved like any others." 251 U.S. at 392, 40 S.Ct. at 183. The *Nix* court explained that this "ensures that the prosecution is not put in a *worse* position simply because of some earlier police error or misconduct." 467 U.S. 431, 443, 104 S.Ct. 2501, 81 L.Ed.2d 377 (1984) (emphasis in original).

Several years before the *Nix* decision, the inevitable discovery doctrine was adopted in this circuit. *United States v. Brookins,* 614 F.2d 1037 (5th Cir.1980). In this seminal case we concluded that the government must show "that when the illegality occurred [the authorities] possessed and were actively pursuing the evidence or leads that would have led to the discovery of the challenged witness...." *Id.* at 1048. In *United States v. Miller,* 666 F.2d 991 (5th Cir.1982), this requirement was broadened. In *Miller,* an illegally seized diary led to certain witnesses. At that time, the police had no leads to those witnesses. Subsequently, the defendant confessed "which provided an independent legal source for the disputed evidence." *Id.* at 997. We concluded that "the testimony produced at trial, which stemmed indirectly from the tainted source, was inevitably discoverable apart from reliance on the unlawful source." *Id.*

Following the *Nix* court's adoption of the inevitable discovery doctrine, we expanded our earlier holdings. In *United States v. Cherry,* 759 F.2d 1196 (5th Cir.1985), we held that "[i]n certain circumstances, however, such as *when the hypothetical independent source comes into being only after the misconduct,* the absence of a strong deterrent interest may warrant the application of the inevitable discovery exception without a showing of active pursuit by the government in order to ensure that the government is not unjustifiably disad-

vantaged by the police misconduct." *Id.* at 1206 (emphasis supplied).

The *Cherry* case, by negative implication, guides today's disposition, for in *Cherry* there were no untainted leads, as there are in the case at bar, and in *Cherry* we upheld the admission of fingerprints taken from an incriminating vehicle which matched the defendant's prints taken after his arrest. The arrest was faulty. We concluded that because there was an independent basis for probable cause and arrest, it was inevitable that the government would have pursued the fingerprint evidence. That scenario broadly fits that now before the court.

Neither *Nix* nor our precedents mandate that the specific leads to Tropic Sales had to be in place before the illegal state search was conducted. It suffices that triggering data, likely to precipitate further investigation, was known to the authorities with responsibility in the subject investigation. LaDuke's complaint, and his connecting of Sinton with Namer, the Clay lead from the Dallas FBI office, the complaint to the Pittsburgh FBI office by Gilmar's attorney, and the informant's report to Powell are independent sources—independent sources which likely would have led to the same information. As such, this evidence qualifies for the independent source exception.

The same applies to the inevitable discovery exception. The Supreme Court has not yet provided a specific definition of inevitability. In *Brookins* we defined it as a *"reasonable probability* that [the] witness would have ... been discovered," 614 F.2d at 1048, and that normal police practices would have uncovered the information. In *United States v. Amuny,* 767 F.2d 1113, 1129, *rehearing denied en banc,* 775 F.2d 301 (5th Cir.1985), we implied that at a minimum, the government would have to offer a theory as to the manner in which agents would have made their discovery. We agree with the commentators that emphasis is on "would" not "might" or "could," (W. LaFave, *Search and Seizure,* 624–25 (1978) Supp. 331 (1986)).[2]

---

2. Defining inevitability is not without difficulty. For example, *see United States v. Bienvenue,* 632

F.2d 910 (1st Cir.1980), and *United States v. Finucan,* 708 F.2d 838 (1st Cir.1983).

There were at least two pertinent FBI investigations proceeding simultaneously. The evidence is sufficiently persuasive that the agents ultimately would have examined all obvious Sinton contacts. Once Namer's bank records were displayed, that contact was apparent and routine investigatory procedures could and did lead to Gazie and Ziegler. The LaDuke matter was carried to the authorities by LaDuke himself.

Diligent and extremely able counsel for defendant would posit that the key question is whether leads were placed on all sources of deposits to Namer's account. We decline the invitation to fix that requirement. We are persuaded that the relevant inquiry directed by *Nix*, and consistent with our precedents, is whether leads were set on all transactions identified as being connected with Sinton, for the other investigation focused on Sinton, and the other sources of information led to Sinton. The district court found that the government had carried its burden of showing by a preponderance of the evidence that the discovery of Gazie and Ziegler was inevitable. We agree.

Discussion of the third exception, attenuation, need not burden this opinion long. Having ruled that the disputed evidence was admissible under the independent source and inevitable discovery exceptions to the exclusionary rule, we need only comment briefly. Under the holdings and rationales of *United States v. Ceccolini*, 435 U.S. 268, 98 S.Ct. 1054, 55 L.Ed.2d 268 (1978); *United States v. Mergist*, 738 F.2d 645 (5th Cir.1984); and *United States v. Miller, supra*, the exception applies to the facts of this case. The availability of a legitimate source reduces the deterrent effect of the exclusionary rule and tilts the balance between "the social cost of exclusion against the efficacy of exclusion in deterring illegal police conduct," *United States v. Miller*, 666 F.2d 991 (1982), in favor of admission.

Having concluded that the evidence was admissible, we need not address the harmless error issue. It necessarily becomes moot.

Finally, Namer raises an issue of collateral estoppel, contending that because he was acquitted of substantive counts for events before August 2, 1977, evidence of matters occurring prior to that time should have been excluded. On retrial, the court allowed testimony about pre-August 2, 1977 incidents with Gazie and Ziegler to provide background for the Gazie/Namer telephone call of that date. In addition, the court allowed introduction of evidence from Texas banking authorities concerning the insolvency of Sinton, offered to prove bad intent of the co-conspirators Cartwright and Simmons, a necessary item of proof.

Namer does not object to the ruling but, rather, the use the government made of the admissible evidence. He maintains that when the prosecutor argued that there was evidence of Namer's intent to defraud prior to July 1, 1977, this constituted a relitigation of issues already determined in Namer's favor by the first jury. As such, Namer contends that the double jeopardy clause of the fifth amendment is implicated.

We agree that the prosecutor made improper references to pre-August 2, 1977 incidents during the closing argument. Assuming, *per arguendo*, that there was constitutional error, we must measure the degree, for there is constitutional harmless error only if the reviewing court concludes that there is no "reasonable possibility that the evidence complained of might have contributed to the conviction." *Blackburn v. Cross*, 510 F.2d 1014, 1019 (5th Cir.1975) (collecting authorities).

Namer contends that "collateral estoppel operates to bar the introduction or argumentation of certain facts necessarily established in a prior proceeding." *United States v. Lee*, 622 F.2d 787, 790 (5th Cir. 1980); *accord United States v. Kalish*, 780 F.2d 506 (5th Cir.1986). He correctly states the proposition, but we are not in agreement with his conclusion. The *Blackburn* case appears factually to be the closest to the one at bar. In *Blackburn*, in the closing argument the prosecutor relied on the combined effect of the testimony of the victim in the sexual assault case before the

jury, and that of the victims in two other sexual assault cases, for one of which the defendant had been acquitted. The prosecutor directed the jury's attention to identifications by the other victims. The *Blackburn* court understandably concluded that the court could not say that the testimony of the previous victim, as to whom Blackburn had been acquitted, was harmless beyond a reasonable doubt. A new trial was ordered.

The instant case differs. Although Namer forcefully maintains that Gazie's testimony was unreliable, we are not prepared to make what is inherently a credibility call different from that made by the jury. Namer challenged Gazie's testimony about the critical telephone call. We can only read the convictions and acquittals one way —the jury believed Gazie. We are persuaded beyond peradventure that it was Gazie's testimony, along with the other evidence and the fabric of the entire case, that convicted Namer, not the impermissible comments of the prosecutor in closing argument.

In so concluding, we note that the prosecutor repeatedly told the jury that the testimony of Cartwright and Simmons related only to Namer's conspiratorial acts after August 2, 1977, and that the testimony of the Texas banking authorities was offered to show that the commitments were worthless. The prosecutor here did not dramatically dwell on those matters as the basis of Namer's guilt as the prosecutor had done in *Blackburn*. Further, the court instructed the jury that they could consider only the charges in the indictment before them. There was no charge based on events prior to August 2, 1977.

For these reasons, Namer's convictions are AFFIRMED.