**UNITED STATES of America,**

v.

**John Patrick HUGHES, Defendant**

**No. CRIM. A. 99–10405–RE.**

United States District Court,
D. Massachusetts.

Jan. 30, 2001.

Theodore D. Chuang, United States Attorney's Office, Boston, MA, for Plaintiff.

Miriam Conrad, Office of the Federal Defender, Boston, MA, for Defendant.

## Opinion

KEETON, District Judge.

### Table of Contents

I. Introduction ........................................................ 66
II. Calendar of Background Facts and Procedural Events ......................... 67
III. Filings By the Parties ............................................... 68
IV. Inadequately Supported Requests of the Government .......................... 69
   A. Introduction .................................................... 69
   B. Assertions About the Address Book ................................... 74
   C. Assertions About the Telephone Toll Records ............................ 74
   D. Assertions About Additional Investigation ............................. 75
V. Legal Tests for Judging Government Uses of the Address Book ................... 75
   A. Legal Tests for Applicability of the Doctrines Invoked by the Govern-
      ment .......................................................... 75
   B. The Government's Argument on Independent Source and Fallacies In It ...... 75
      1. The Government's Framing of the Argument .......................... 77
      2. The Generality of the Government's Citations to Precedent .............. 77
      3. Findings of the Court ........................................... 78
   C. Fallacies in the Government's Argument of Attenuation .................... 78
      1. The Government's Framing of the Argument .......................... 78
      2. Findings of the Court ........................................... 79
   D. Fallacies in the Government's Argument of Inevitable Discovery ............. 80
      1. The Government's Framing of the Argument .......................... 80
      2. A Matter of Timing ............................................ 80
VI. Findings Bearing on Use of Particular Witnesses at Trial ..................... 81
   A. Introduction .................................................... 81
   B. Particular Witnesses ............................................. 81
      1. Megan Clancy ................................................. 81
      2. Heather Caisse ................................................ 82
      3. LaShaunna Santos .............................................. 82
      4. Frank Calisi .................................................. 85
ORDER ................................................................. 86

## I. Introduction

This opinion concerns limitations that I conclude I must impose, in order to have a fair trial, on the government's efforts to invoke what it calls the *independent source doctrine*, the *attenuation doctrine*, and the *inevitable discovery doctrine.*

After an evidentiary hearing extending through sessions occurring from time to time over a span of several weeks, concluding with oral argument on January 5, 2001, requests by both parties, each for a sweeping order in that party's favor, are ready for decision.

In a previous order (Docket No. 46), made by the court on May 12, 2000 and entered by the clerk on May 16, this court denied defendant's motion (Docket No. 41, filed May 26, 2000) to strike evidence and denied the government's application (Docket No. 13, filed March 1, 2000) for defendant's drug treatment records.

In another previous order (Docket No. 54, made and entered on July 7, 2000) the court denied defendant's motion to suppress statements and physical evidence. In the Opinion and Order of July 7, 2000, however, the court notified the parties that the contents of an address book seized on June 21, 1999

> will be suppressed and any evidence found as a direct result of the copying and reading of the contents of the address book will also be suppressed, unless the government can show an independent basis for having discovered that evidence or can show that the evidence falls under the inevitable discovery doctrine. *See Nix v. Williams,* 467 U.S.

431, 104 S.Ct. 2501, 81 L.Ed.2d 377 (1984).

Docket No. 54 at 26.

This court determined in the Opinion and Order of July 7, 2000, that a police officer of the Town of East Bridgewater, for whose conduct the United States Attorney and his assistants as prosecutors in this case are accountable, seized without authority the address book, Exhibit I in the evidentiary hearing in this case, allegedly maintained by defendant.

In part as an additional sanction for the unauthorized seizure of the address book and in part on other grounds explained in this opinion, defendant seeks a sweeping order of suppression of evidence that the government wishes to be allowed to offer at trial, if it chooses to do so, to support all of its charges stated in the indictment in this case. Those charges include making false statements in connection with the purchase of firearms (Counts One, Two, and Three) and being a drug user in possession of a firearm (Counts Four, Five, and Six).

Not to be outdone by the aggressiveness of defendant's requests, the government seeks a sweeping order in its favor in every respect.

For reasons explained in this opinion, I conclude that neither party's position can be sustained in full and that an order tailored to the distinctive circumstances of this case imposes some restraints on the government but not restraints as sweeping as the defendant proposes.

Part II of this opinion presents a calendar of background facts and procedural events relevant to the decision of all pending motions and related matters.

Part III identifies all filings by the parties that have a bearing, directly or indirectly, on the matters decided.

Parts IV–VI explain the reasons for the Order stated at the end of this opinion.

## II. Calendar of Background Facts and Procedural Events

This calendar summarizes, in the sequence of their occurrence, background facts that, except as otherwise indicated, are beyond genuine dispute and procedural events in the development of this case.

6/18/99 Special Agent Murphy of the Bureau of Alcohol, Tobacco and Firearms (ATF) spoke with Detective Allen of the East Bridgewater Police Department (EBPD) and told Allen that Murphy had initiated an investigation of John Hughes, a resident of East Bridgewater, who had recently purchased eleven handguns from Roach's Sporting Goods in Cambridge over a one-week period on three separate dates. Murphy told Allen that Hughes was suspected of unlawfully transferring those weapons. Murphy also enlisted Allen's aid by asking Allen to gather some background information on John Hughes from within the EBPD records to aid the investigation by, for example, confirming Hughes's residence as 824 Plymouth Street in East Bridgewater and confirming that his license to carry firearms was still valid.

6/19/99 In response to Agent Murphy's request, Detective Allen provided Murphy with a copy of Hughes's valid license to carry firearms and the result of a criminal record check with the Massachusetts Board of Probation regarding Hughes. Allen also told Murphy that he would conduct surveillance of 824 Plymouth Street in East Bridgewater, the address listed on Hughes's driver's license, to determine whether Hughes did currently live at that address.

Allen later testified that he did not recall Murphy's specifically asking that Allen conduct surveillance. Allen also testified that Murphy indicated that he agreed with Allen's plan to conduct surveillance of the address. Allen said that his understanding with Murphy was that they would

touch base within a week, but that no specific time had been set. Murphy gave Allen his pager number for the purpose of further contact. Agent Murphy stated that he told Allen that he would keep Allen abreast of further information and activity because he anticipated hearing from other retail gun stores if Hughes arrived to purchase other firearms.

Allen testified that his next communication with Agent Murphy was on June 21st when he received several faxes from Murphy that were copies of Hughes's firearms transaction records from June 10, 12 and 17 from Roach's Sporting Goods. Agent Murphy testified that it did not occur to him either on June 18th or on June 21st that Detective Allen was going to arrest John Hughes. In fact, Agent Murphy testified that he was upset when he learned from Detective Allen that John Hughes was arrested by the EBPD on the 21st of June.

> 6/19/99 At approximately 5:44 p.m., while Allen was conducting surveillance of 824 Plymouth Street, he observed a white male standing outside the passenger's side of a beige Buick sedan.

Detective Allen later testified that he believed, based on the photographs from Hughes's license to carry a firearm issued in 1996, the white male he observed was Mr. Hughes.

> 6/21/99 When Detective Silva arrived for duty at 4:00 p.m., Detective Allen told Silva that he was conducting surveillance in an attempt to locate a man named John Hughes from East Bridgewater who was driving with an expired and non-renewable driver's license.

Allen later testified that he explained to Silva that at some point during the course of Allen's shift, if he located Hughes, he might need Silva's assistance in stopping Hughes's motor vehicle. Also, Silva later stated that Allen told him that John Hughes was a suspect in an ATF investigation in which Allen was assisting. Both Silva and Allen testified that they ran a check with the Registry of Motor Vehicles to verify that John Hughes's license was expired and non-renewable. Detective Allen did not give Silva any more information or direction until later that evening at approximately 8:00 p.m.

> 6/21/99 At approximately 7:10 p.m., Detective Allen, while traveling westbound on Plain Street, observed the beige sedan he had seen previously at 824 Plymouth Street, traveling eastbound.

Allen later testified that he observed a lone male driver in that vehicle. Allen followed it to the driveway of the 824 Plymouth Street address. Allen stationed his car several hundred yards away but maintained visual contact of the driveway.

> 6/21/99 At approximately 8:05 p.m., the beige sedan left its parking spot and proceeded westbound.

Detective Allen later testified that the beige sedan turned into a small shopping plaza located directly across the street from where Allen was stationed. That plaza contains, among other stores, a Dunkin Donuts and a convenience store. Allen observed a white male driver, who at this point he confirmed to be Mr. Hughes, get out of the vehicle and enter one of the stores in the plaza. While watching the driver leave 824 Plymouth Street and drive to the plaza, Allen radioed Officer Silva and told him that the subject he had under surveillance was on the move. Allen also asked Silva to go to the location they had previously discussed at the rear of the high school to set up a radar position. (Silva later stated that Allen called him at approximately 8:00 p.m. to set up his radar position. The time discrepancy of not more than five minutes is not enough of a discrepancy to draw any significant conclusion from it.)

Silva later testified that he followed Allen's instructions and set up a radar location on Plymouth Street near the rear entrance to the East Bridgewater High

School, a location that both Allen and Silva explained is often used by the EBPD for speed traps, and began looking for a gold or brown Buick with license plate number 676XMJ that would be heading in his direction. Silva testified that Allen then radioed him to tell him that John Hughes would be driving the car in question and that he was heading his way. Silva stated that it was his intention to stop Hughes for committing a moving violation but not necessarily to assist in the ATF investigation, despite the fact that Detective Allen had explained to Silva that he was helping Special Agent Murphy. Silva also testified that he had, in the past, sought out drivers who were driving on expired licenses with the intention of arresting them.

Allen later testified that he followed the Hughes vehicle for several hundred yards and watched it drive toward Silva's position. He then broke off visual contact with the vehicle.

Silva later testified that several minutes after having heard from Allen that he had identified and located Hughes, Silva observed the Buick sedan in question speed by his post. Silva's radar unit read 42 miles per hour, seventeen miles over the posted speed limit. Silva activated police lights, and the Buick pulled to the side of the road. Silva then radioed for backup. Silva says Officer Flint responded that he was on his way. Silva stated that even if Hughes had not been speeding, had Detective Allen asked Silva to stop Hughes, Silva would have done so.

Plymouth Street is a main road with two lanes, one in each direction, that, according to all officers who testified in court, is heavily traveled. It does not have a breakdown lane or a shoulder. Silva explained that a stop sign is located at the end of the road. Silva testified that when pulled to the side of the road, the Buick was nevertheless blocking traffic. Flint confirmed this fact in his testimony. The town common, where the town offices and the police station are located, was only a few hundred feet away and up the street.

Parking lots are located in front of the police station and town offices. Silva said that the town common was visible from where the Buick and his cruiser were pulled over.

Silva testified that he approached the driver of the vehicle, who was indeed John Hughes, and advised him that he was being pulled over for speeding. Hughes handed over his license. Hughes was alone in the car. Silva returned to his cruiser and ran a Registry check on the license on his lap-top computer. The report came back that the license had expired and was non-renewable.

Silva testified that Silva returned to Hughes and informed Hughes that he was going to be arrested for driving without a license. Upon Silva's request, Hughes stepped out of the vehicle and to its rear, at which point Officer Flint arrived. Silva informed Hughes that his car would be towed from the scene. Silva cannot remember how, if at all, Hughes responded to the fact that his car was to be towed. Silva stated that he and Officer Flint did not have any discussion about whether an inventory search would be conducted but that he understood that Flint would conduct an inventory search. Silva also told Officer Flint to be careful because a gun might be involved. Silva testified that it was Silva's understanding at the time of the arrest that the search of Hughes's car was not one incident to arrest but was for inventory purposes. Flint testified that Flint was not aware at that point of any ongoing investigation of John Hughes.

6/21/99 At approximately 8:00 to 8:21, Hughes was arrested.

Silva testified that, based on Silva's conversations with Allen and Silva's interpretation of the radio communications that evening, Silva arrested Hughes between 8:15 and 8:20 p.m. After Silva placed Hughes in the rear of his cruiser, Silva called for a tow truck and returned to the police station. When Allen, who had been stationed farther down the road, heard

over the radio that Silva had effected the arrest of Hughes, Allen returned to the police department. Allen also paged Agent Murphy. Agent Murphy returned Allen's page and Murphy, after learning more details of the arrest, informed Allen that Murphy would proceed to the East Bridgewater Police Station to meet with Mr. Hughes.

Silva, in later testimony, estimated that approximately five minutes elapsed between the time Hughes was arrested and the time they left the scene headed for the police station. The police station is only a quarter of a mile from the place where Hughes was stopped, Silva estimated that it took them only a minute or so to arrive at the station. Silva stated that, several minutes after their arrival, he was advised by the dispatch officer that Officer Flint had found a loaded 9-millimeter Ruger pistol underneath the driver's seat.

Testimony of the various officers was consistent in saying in substance that when Silva and Hughes departed from the place of arrest, Officer Flint had not yet begun to search the vehicle; Flint was in his cruiser, moving it to the side of the road where Silva's cruiser had been parked.

Officer Flint testified that he began searching Hughes's car approximately two minutes after Hughes and Silva drove away. He said that he had already decided that he was to search the car because it was going to be towed. Flint said that Flint's search of the entire passenger compartment and the trunk took approximately twenty minutes. During the search, Flint found an unloaded magazine in the console of the vehicle in between the two front seats. Also, Flint found a loaded Ruger handgun underneath the front driver's seat with thirteen rounds of ammunition in it. Flint also found a black address book in the driver's door.

Flint testified that when he completed the search, Flint radioed back to the station that he found a handgun. Flint stated that while still at that location Flint also filled out a Record of Inventory and Tow Sheet, a standard form issued by the EBPD. The time on the tow sheet said 8:30 p.m., a time that Flint stated he got from the clock in his police cruiser. All three police officers testified that a Record of Inventory and Tow Sheet is always filled out when a car is towed by the police to safeguard the belongings in the car—to protect individuals against lost property and to protect police against claims of lost property.

Officer Flint admitted, however, to omitting several items from the sheet. Specifically, he testified that he omitted the address book and the magazine clip from the list on the tow sheet. Officer Flint stated that he considered the ammunition part of the gun and for this reason did not include that on the sheet separately. Flint claims, however, that the omissions of the address book and the magazine were oversight on his part. I credit his claim of mistake in this matter and do not find that he omitted the two items intentionally.

All three officers testified that discovering a gun in a vehicle in East Bridgewater is an uncommon occurrence. Officer Flint, in particular, testified that this was the first time he had found a gun in a vehicle.

Allen testified that Allen returned to the scene of the motor vehicle stop after hearing, at the police station from the dispatcher, that Officer Flint had found a loaded handgun in Hughes's Buick sedan. Flint's radio communication to the police station regarding the found gun was at 8:28 p.m. (Flint's testimony that he radioed the station twenty minutes after he began the search, which would be about 8:40 p.m., is not consistent with the time suggested by the testimony of Detectives Allen and Silva. And it is not consistent with the time noted on the Inventory Form. It is off by about ten minutes. I find that this disparity does not discredit what I find to be otherwise credible testimony on the part of Officer Flint. Under cross-examination, Officer Flint testified that he was not

wearing a watch and that the times to which he was testifying were his best estimates.)

Allen and Flint testified that when Allen arrived at the scene, Flint was standing by the tow truck. Allen testified that he asked Flint to show him the handgun and that Flint displayed the 9–millimeter Ruger pistol that was fully loaded. Allen testified that Flint also showed Allen an empty magazine clip for the handgun that Flint found in the center console of the car and an address book that he found in the open console compartment of the driver's side door. Flint testified that he does not recall showing Allen the handgun but that he does recall talking about it with Allen. Contrary to Detective Allen's testimony that he took the gun and the magazine clip from the scene, Officer Flint testified that he gave the gun and the magazine to Officer Silva at the police station. When and how the gun reached the police department does not have significant bearing, however, on my findings of fact recited in this opinion. For this reason, I make no determination as to the accuracy of Officer Flint's and Detective Allen's testimony on this point.

The testimony of Detective Allen and Officer Flint is in agreement that Flint handed Allen the address book at the scene from which the vehicle was towed. Flint said that he thought the address book might be something Allen would want to look at. Both Flint and Allen testified that Allen looked at and took possession of the address book while at the scene from which the vehicle was towed. Allen said that he took the address book, in particular, because, based on his knowledge of Agent Murphy's investigation, he thought it might contain useful information, such as phone numbers. Allen said that he did not read the book at the moment, however. Flint confirmed this statement. Flint said that Detective Allen just opened it up and thumbed through it. Flint said that he does not recall recognizing or reading anything specific in the address book. Allen

said that the tow truck was in the process of loading the vehicle when he left the scene and that Officer Flint remained behind to assure the proper tow of the vehicle.

Allen testified that when Allen returned to the police station, he made two photocopies of the address book's contents, one for his records and the other for Agent Murphy. Agent Murphy testified that he had asked for a copy of the address book because several notations caught his attention that he thought would be helpful to his investigation. One was for Roach's Sporting Goods and the other was of an individual whose name he remembered from having participated in a search warrant relating to the theft of firearms. Allen stated that Allen had to add the address book to the listing on Mr. Hughes's booking sheet of "personal property" taken from the arrestee at the scene. Allen added the address book to the list because the form as already filled out omitted mention of the address book.

12/8/99 The grand jury returned a six-count indictment against John Patrick Hughes. Counts One, Two, and Three allege that on three separate occasions the defendant made false statements in connection with the purchase of firearms, a violation of 18 U.S.C. § 922(a)(6). Counts Four, Five, and Six allege that on three separate occasions the defendant was a drug user in possession of a firearm, a violation of 18 U.S.C. § 922(g)(3).

12/21/99 On December 21, 1999, John Patrick Hughes pled not guilty to the charges in the indictment.

2/25/00 The government filed an Application for an Order Authorizing and Requiring Disclosure of Drug Treatment Records. See Docket No. 13.

4/5/00 Defendant filed a motion to suppress statements and physical evidence. See Docket No. 33. Government filed an Opposition. See Docket No. 37. Defendant filed a reply. See Docket No. 48.

4/12/00 After proper notice was issued to all persons holding the drug treatment records, as is required under 42 C.F.R. § 2.65, the court began a three-day hearing concerning the Government's Application for an Order Authorizing and Requiring Disclosure of Drug Treatment Records.

5/12/00 The court issued an Opinion denying the Government's Application for an Order Authorizing and Requiring Disclosure of Drug Treatment Records.

6/20/00 The court began a hearing on the defendant's motion to suppress. That hearing continued for a second day on June 27, 2000. The government called four witnesses to the stand: Detective John L. Silva, Detective Scott Clifford Allen, Special Agent William J. Murphy, and Patrolman Thomas E. Flint. Defense counsel cross-examined at length and did not call any witnesses.

6/27/00 After receiving additional evidence, the court heard argument and took the matter under advisement.

7/7/00 Court issued Memorandum and Order of this date (Docket No. 54).

### III. Filings By the Parties

This summary of filings is limited to those filings that have been docketed by the clerk. Documents and things marked as received in evidence during the evidentiary hearing or otherwise identified as marked items proffered are not included here.

4/5/00 Motion by John Patrick Hughes to Suppress Statements and Physical Evidence (Docket No. 33).

9/28/00 Government's Motion to Allow Witness Testimony (Docket No. 62) with supporting memorandum (Docket No. 63), and opposition (Docket No. 65).

10/18/00 Evidentiary hearing held. CLERK'S NOTES, docketed 10/19/00, re: evidentiary hearing. Colloquy re: government's motion to allow witness testimony. Colloquy re: schedule. Reset evidentiary hearing for 9:00 10/27/00 for John Patrick Hughes. Colloquy re: the government's production of documents. (Docket No. 66).

10/18/00 ENDORSED ORDER mooting Docket No. 58 motion for scheduling of a trial date.

10/19/00 Evidentiary hearing, CLERK'S NOTES (Docket No. 66).

10/26/00 Transcript of proceedings for motion hearing held on October 18, 2000 before Judge Keeton (Docket No. 67).

10/26/00 Transcript of proceedings for motion hearing (Day 4) held on June 27, 2000 before Judge Keeton (Docket No. 68).

10/27/00 Motion hearing as to John Patrick Hughes held. CLERK'S NOTES re: motion hearing: Special Agent Murphy testified. REK orders the government to produce certain criminal records in Agent Murphy's files and to produce the name of the ATF intern who worked on the case. Evidentiary hearing/pretrial conference will continue 11/15/00 9:00. (Docket No. 69).

11/06/00 Transcript of proceedings for motion hearing held on October 27, 2000 hearing date before Judge Keeton (Docket No. 70).

11/15/00 Motion hearing held. CLERK'S NOTES re: motion hearing: Testimony of Agent Murphy continued. Defendant calls Eva Argrew to testify. Colloquy re: schedule. Evidentiary hearing will continue Tuesday, November 21, 2000 at 10:30. (Docket No. 72).

11/17/00 Status conference held. CLERK'S NOTES re: status conference: set oral hearing for 2:00 12/21/00. Defendant's submission due 11/12/00. Government response due 11/19/00. Reset jury trial for 9:00, 2/12/01. (Docket No. 71).

11/21/00 Evidentiary hearing held. CLERK'S NOTES re: evidentiary hearing: Detective Allen testified as government's rebuttal witness. (Docket No. 73).

11/27/00 Transcript of proceedings for motion hearing (Day 3) held on November 15, 2000 (Docket No. 74).

11/27/00 Transcript of proceedings for motion hearing (Day 4) held on November 21, 2000 (Docket No. 75).

12/13/00 Assented to motion filed by John Patrick Hughes for leave to file memorandum one day late (Docket No. 76), allowed by endorsed order.

12/13/00 Memorandum filed by John Patrick Hughes re: admissibility of fruits of illegally seized address book (Docket No. 77).

12/20/00 Memorandum by USA as to John Patrick Hughes re: response to post-hearing memorandum on the motion to allow witness testimony (Docket No. 79).

12/14/00 ENDORSED ORDER granting Docket No. 76.

12/21/00 Motion hearing held. CLERK'S NOTES re: motion hearing: oral arguments re: defendant's oral motion to re-open evidence. Set evidentiary hearing 10:30,1/5/01 (Docket No. 78).

1/5/01 Evidentiary hearing held. CLERK'S NOTES as to John Patrick Hughes, re: hearing held. Oral arguments re: government's motion to allow witness testimony (Docket No. 62) REK will take the matter under advisement. Set pretrial conference for 12:00 1/31/01 for John Patrick Hughes; REK will not make an order for disclosures (Docket No. 80).

1/19/01 Motion by John Patrick Hughes for order to accompany trial subpoenas (Docket No. 81).

1/24/01 Response by USA as to John Patrick Hughes in opposition to motion (Docket No. 81) for order to accompany trial subpoenas (Docket No. 82).

## IV. Inadequately Supported Requests of the Government

### A. Introduction

In this opinion I have corrected several of the dates stated in the Opinion of May 12, 2000 as year 2000 dates, which were in fact year 1999 dates. Those errors in the May 12, 2000 Opinion did not have any effect on the court's decision and did not cause any prejudice to either party.

The United States in its Motion to Allow Witness Testimony (Docket No. 62) asks the court, "notwithstanding" the previous order (Docket No. 54 at 26) "suppressing as evidence the address book seized from the defendant on June 21, 1999," to rule that "the following witnesses will be permitted to testify at trial if called by the government: (1) Megan Clancy, (2) Heather Caisse; (3) LaShauna Santos; (4) Frank Calisi." Docket No. 62 at 1. The grounds asserted are "the witnesses should be permitted to testify pursuant to the **independent source doctrine**, the **attenuation doctrine**, and/or the **inevitable discovery doctrine**." *Id.* (emphasis added).

In the initial supporting Memorandum of Law (Docket No. 63) and in its repeated arguments (filed and oral), the government presents these three "doctrines" as independently supporting the government's sweeping contention that it be allowed free rein to choose or not, without advance notice, whether to call each of the named witnesses. Also, the government presents these three "doctrines" as interlocking and mutually reenforcing, so that even if this or a higher court rejects their validity as independent grounds it should nevertheless hold that together they support the government's sweeping contention. Taken together, these arguments present a contention for an unprecedented government right of control over trial proceedings that is fundamentally inconsistent with the trial

court's authority to order that the trial be conducted by procedures that are impartial and fair to both the government and the defendant.

The government's description of the "RELEVANT FACTS" (in Docket No. 62, pages 2–13, and in later filings and oral arguments on the record) is aggressively partisan and is both exaggerated in the government's favor and incomplete. It takes as true the inferences for which the government argues in the face of conflicting admissible evidence and omits disclosure of the conflicting evidence that it knows will be allowed in evidence during cross-examination of any witnesses it must call during the government's case-in-chief in order to meet its burden of proof.

### B. Assertions About the Address Book

In its recitation of "RELEVANT FACTS," the government's assertions about the address book begin with the statement: "Although the address book at issue in this case was located early in the investigation, its role in the investigation was extremely limited." Docket No. 63 at 2. For the reasons explained in the factual analysis I recite in Part II of this opinion, and the additional factual analysis stated below, I find that this assertion by the government is insupportable. Instead, I find that the address book has had a major role in the investigation and will have a major role in the trial unless I conclude that by evidentiary rulings I should substantially reduce its role.

The government asserts next: "the leads followed to identify and locate the potential witnesses arose from analysis of telephone toll records, witness interviews, and records checks independent of the address books." Id. Even if the phrase "independent of the address book" had been omitted, this assertion would have been only a half-truth. With that phrase in place, I find that this assertion is false. ATF Agent Murphy continued to carry the address book in his brief case, even when he left other parts of his investigative file

out. And I find that he reexamined the address book often enough that he remained consciously aware of things in it that he could, if need be, look at again to refresh his memory on things such as precise telephone numbers, license numbers, and addresses.

### C. Assertions About the Telephone Toll Records

In its recitation of "RELEVANT FACTS," the government's assertions about the telephone toll records begin as follows:

B. The Telephone Toll Records

Following Hughes's arrest, through a grand jury subpoena, SA Murphy obtained telephone toll records for Hughes's home telephone number, shared by others, of 508–378–3869. In addition, from a grand jury subpoena for a credit report of Hughes, SA Murphy learned in July 1999 that Hughes had applied for cellular telephone service from Cellular One. [Exhibit 2: Hughes Credit Report] Through a grand jury subpoena, SA Murphy obtained records for the Cellular One account held by Hughes. [Exhibit 3: Excerpts of Cellular One Toll Records] After receiving these records in early August 1999, SA Murphy analyzed the records and noted which telephone numbers had received multiple calls from Hughes. In so doing, SA Murphy made handwritten notes in which he tallied the number of calls made over the cellular telephone to the various telephone numbers. [Exhibit 4: Notes on Cellular One Records] Using a computerized phone record disc, SA Murphy also ran phone numbers found on the toll records to identify the name and address of the subscribers. When SA Murphy printed out the results of these checks, each phone number and subscriber record information printed out on a separate sheet, including information for Gina Holyoke, Eva Perkins, and a business known as Calisi's Flowerland. [Exhibit 5: Phone Disc Subscrib-

er Records (Excerpts) ] SA Murphy also printed numerous other subscriber records which are not relevant to this motion. *At some point in the investigation, SA Murphy compared his analysis of the telephone toll records to the entries in the address book to determine whether there was overlap.* On the same sheets on which he had made notations based on reviewing the toll records, SA Murphy made supplemental notations in which he used a marker to note information in the address book relating to those phone numbers already listed based on the toll records. [Exhibit 4: Notes on Cellular One Records]

Docket No. 63 at 3–4 (emphasis added).

The use of the address book, acknowledged in the emphasized sentence in the above quotation from the government's memorandum in support of its Motion to Allow Witness Testimony (Docket No. 62), was a knowing and willful use of the address book. The emphasized sentence fails to state when this knowing and willful use occurred, instead merely saying "[a]t some point." The use of the singular, "point," is misleading in fact. I find from all the evidence before me that beyond doubt Special Agent Murphy used repeatedly knowledge he had first acquired by examining the address book. The first examination gave him knowledge of the general nature of the information it contained. Both he, and at his direction or knowing acquiescence, from time to time one or more others whom he drew into assisting him in the investigation reexamined the address book to obtain and use addresses, telephone numbers, driver license numbers, and other details that one could hardly be expected to carry in memory.

The government argues that these kinds of uses of factual information in the address book did not constitute "use" of the address book. That contention is erroneous as a matter of law.

None of the judicial opinions cited by the government, and no judicial opinion of which I am aware, supports such a narrow interpretation of "use" or any of its derivatives (such as "used" or "using" or "making use of").

The fact that Special Agent Murphy, or a person he drew into assisting him in the investigation, made photographic copies of excerpts from the address book, and thereafter "made notations" on these copies does not establish that he did not "use" the address book itself or that he and his assistants "used" it only once—when making the photographic copies. Every time he or an assistant looked at the annotated document, whether it was the address book itself or a photographic copy of some part of it, or a photographic copy of toll records that he or an assistant annotated with information that he first became aware of from examining the address book or being told about what some other person assisting him had seen there, he "used" the address book again.

### D. Assertions About Additional Investigation

In its recitation of "RELEVANT FACTS," the government's assertions about "Additional Investigation" begin as follows:

C. Additional Investigation

In addition to reviewing the address book and the toll records, SA Murphy's investigation also included numerous witness interviews which led to other investigative leads. Among the witnesses interviewed were Hughes's relatives, Eva Argrew, Jason Hughes, and Patricia Hughes. The investigation also included motor vehicle record checks, criminal record checks, and other investigatory steps. The manner in which SA Murphy located each of the potential witnesses at issue in this motion is set forth in detail below.

Docket No. 63 at 4. The explanation "set forth in detail below" starts at page 5 and extends to the middle of page 13 of Docket No. 63, where "ARGUMENT" begins.

## V. Legal Tests for Judging Government Uses of the Address Book

### A. Legal Tests for Applicability of the Doctrines Invoked by the Government

The three "doctrines" invoked by the government have been described in leading cases in the following way:

*First.* For the "doctrine of inevitable discovery to apply, the prosecution must establish *"by a preponderance of the evidence"* that the information ultimately or inevitably would have been discovered by lawful means . . . ." *Nix v. Williams,* 467 U.S. 431, 444, 104 S.Ct. 2501, 81 L.Ed.2d 377 (1984) (emphasis added).

*Second.* In *Nix* the Court points out that "[t]he independent source doctrine allows admission of evidence that has been discovered by means *wholly independent* of any constitutional violation." *Id.* at 443, 104 S.Ct. 2501 (emphasis added).

*Third.* Under an attenuation analysis, the exclusion of "live-witness testimony" requires "a closer, more direct link between the illegality" and the "live-witness testimony." *United States v. Ceccolini,* 435 U.S. 268, 278, 98 S.Ct. 1054, 55 L.Ed.2d 268 (1978). Factors to consider include: 1) whether the potential witness will testify of his own free will, 2) whether the illegally seized evidence was used in questioning the potential witness, 3) whether a substantial period of time elapsed between the time of the illegal seizure and the initial contact with the potential witness, 4) whether the identity of the potential witness was well known to those investigating the case before the illegal seizure, and 5) whether the evidence indicates that the policeman conducted the illegal search with the intent to find tangible evidence bearing on the defendant's alleged unlawful activity. *See id.* at 278–80, 98 S.Ct. 1054.

■ *Ceccolini* explicitly explains the nature of the legal test for "attenuation" analysis as a "factors" test. Close examination of the explanation in *Nix* of the legal tests for applicability of the "doctrine of inevitable discovery" and the doctrine of "independent source" reveals that they, too, are "factors" tests. That is, none of the precedents invoking these doctrines prescribes a bright-line test that tells the district judge to make one or more explicitly defined factual determinations and then declare that an explicitly defined result follows. Instead, the district court must make a discretionary choice based on evaluation of multiple factors. On the contrast between bright-line and evaluative legal tests generally, *see* Keeton, *Judging in the American Legal System,* § 3.1.2(d) (Lexis Law Publishing, 1999).

### B. The Government's Argument on Independent Source and Fallacies In It

The government begins its "ARGUMENT," in its memorandum in support (Docket No. 63) of its Motion to Allow Witness Testimony (Docket No. 62), with the following introduction:

> In light of the Court's ruling that "any evidence found as a direct result of the copying and reading of the contents of the address book will also be suppressed, unless the government can show an independent basis for having discovered that evidence or can show that the evidence falls under the inevitable discovery doctrine," *Memorandum and Order,* at 26, the government seeks a ruling that Megan Clancy, Heather Caisse, LaShaunna Santos, and Frank Calisi would be permitted to testify at trial if called by the government, because although these individuals are referred to in the address book, they were discovered by the government through means independent of the government's seizure of the address book.

Docket No. 63 at 13–14.

The assertion that "they" (referring to all of the witnesses Megan Clancy, Heather Caisse, LaShaunna Santos, and Frank

Calisi) "were discovered by the government through means *independent of* the government's *seizure* of the address book," *id.* (emphasis added) is phrased in a way that obscures the issues at stake, for all of the following reasons.

*First.* Of course, the unauthorized "seizure" of the address book was an antecedent event in the sequence of events that led to the examination of the address book and excerpts from it by Agent Murphy and each of the others assisting Agent Murphy in his investigation. But all these examinations were beyond doubt foreseeable in the sense relevant under the legal tests applicable to the circumstances of this case. Thus, the government gains nothing by focusing on "seizure" rather than on "examination" or "use."

*Second.* No intervening event broke the direct causal connection. Thus, the "examination" and "use" were not "independent of" the "seizure." They were instead foreseeable intervening events that occurred between the moment of "seizure" and the various events of "examination" and "use" throughout the ongoing investigation.

*Third.* In spite of the government's contention to the contrary, the ordinary meaning of the words used in the statement of the applicable legal tests in leading judicial opinions is not contrary to a straightforward common-sense interpretation of those words. An explanation of this third point is developed immediately below.

### 1. The Government's Framing of the Argument

In stating its argument on "Independent Source," in its memorandum in support (Docket No. 63) for its Motion to Allow Witness Testimony (Docket No. 62), the government states its position in the following way:

A. Independent Source

It is firmly established that evidence linked to a Fourth Amendment violation is admissible if knowledge of that evidence was derived from an "independent source." *Silverthorne Lumber Co.,* 251 U.S. at 392, 40 S.Ct. 182 ("If knowledge of [the facts]· is gained from an independent source, they may be proved like any others.") *Nix v. Williams,* 467 U.S. 431, 443, 104 S.Ct. 2501, 81 L.Ed.2d 377 (1984); *Segura v. United States,* 468 U.S. 796, 805, 104 S.Ct. 3380, 82 L.Ed.2d 599 (1984). "In the classic independent source situation, information which is received through an illegal source is considered to be clearly obtained when it arrives through an independent source." *United States v. Silvestri,* 787 F.2d 736, 739 (1st Cir.1986).

The rationale for this doctrine is that "while the government should not profit from its illegal activity, neither should it be placed in a worse position that it would otherwise have occupied." *Murray v. United States,* 487 U.S. 533, 542, 108 S.Ct. 2529, 101 L.Ed.2d 472 (1988). "When the challenged evidence has an independent source, exclusion of such evidence would put the police in a worse position than they would have been in absent any error or violation." *Nix,* 467 U.S. at 443, 104 S.Ct. 2501. The independent source doctrine applies even if the evidence was first discovered through unlawful means, if it is "later obtained independently from activities untainted by the initial illegality." *Murray,* 487 U.S. at 537, 542, 108 S.Ct. 2529.

Docket No. 63 at 14–15.

### 2. The Generality of the Government's Citations to Precedent

A careful, common-sense reading of the foregoing statement of the government's position discloses that the citations are only to the very general proposition that the government may use knowledge "derived from" an "independent source." The inadequacy of these citations to support the extraordinary rulings requested by the government is apparent for each of the reasons stated immediately below.

■ *First.* The phrase "derived from," as used in the context of this case is misleading. In relation to most issues, *it is not supported in the record before the court.* The relevant knowledge is not "derived from" an identified source if it was already known to Special Agent Murphy because of what he had seen in the address book or had been told was there.

■ *Second.* An identified "source" of knowledge is not "independent" if what Special Agent Murphy had seen in the address book, or had been told was there, materially aided him in acquiring access to the "source" ·that the government characterizes as "independent."

### 3. Findings of the Court

■ In this instance, on the findings and conclusions I have stated in preceding parts of this opinion and additional findings and conclusions stated in the remaining Parts of this opinion, below, I find that, with limited exceptions noted in later Parts of this opinion, below, the "sources" identified below, viewed from a perspective as favorable to the government as governing law permits, are cooperating rather than independent in nature. By analogy to similar concepts in the common law that bear upon claims made in civil actions for damages, instead of being free of legal accountability because another actor also contributed to the harm to the defendant's interests in this criminal action, the government remains legally accountable for its wrongdoing. Each of the other identified sources (perhaps apart from "Acts of God," not involved in this case) is not an "independent" source. It is instead a "contributing source."

## C. Fallacies in the Government's Argument of Attenuation

### 1. The Government's Framing of the Argument

In stating its argument on "Attenuation," in its memorandum in support (Docket No. 63) of its Motion to Allow Witness Testimony (Docket No. 62), the government states its position in the following way:

As the independent source doctrine makes clear, in order for evidence to be excluded as "fruit of the poisonous tree," the Fourth Amendment violation *must at least be a "but for" cause of the discovery of the evidence.* Segura, 468 U.S. at 815, 104 S.Ct. 3380. Yet even if evidence did, in fact, come to light through a chain of causation that began with a Fourth Amendment violation, it is not necessarily inadmissible. *See id.;* United States v. Ceccolini, 435 U.S. 268, 276, 98 S.Ct. 1054, 55 L.Ed.2d 268 (1978). If "the chain of causation proceeding from the unlawful conduct has become so attenuated or has been interrupted by some intervening circumstance so as to remove the 'taint' imposed upon that evidence by the original illegality," the evidence is admissible. United States v. Crews, 445 U.S. 463, 471, 100 S.Ct. 1244, 63 L.Ed.2d 537 (1980); Segura, 468 U.S. at 815, 104 S.Ct. 3380; *see also Nardone v. United States,* 308 U.S. 338, 341, 60 S.Ct. 266, 84 L.Ed. 307 (1939). Put another way, if the evidence "has been come at by . . . means sufficiently distinguishable to be purged of the primary taint," it is admissible. *See Wong Sun,* 371 U.S. at 487–88, 83 S.Ct. 407.

In evaluating whether the link between the constitutional violation and the evidence at issue had become so "attenuated" that the taint has effectively been dissipated, courts should recognize that *the connection is more likely to be attenuated when the allegedly tainted evidence is testimony of live witnesses,* rather than physical evidence. "[T]he exclusionary rule should be invoked with much greater reluctance where the claim is based on a causal relationship *between a constitutional violation and the discovery of a live witness than when a similar claim is advanced to support suppression of an*

*inanimate object.*" *Ceccolini,* 435 U.S. at 280, 98 S.Ct. 1054. In justifying such a conclusion, the Supreme Court noted that the causal link between a Fourth Amendment violation and *witness testimony is typically more attenuated because of the intervening factors of the witness's free will, perception, and memory:*

> The fact that the name of a potential witness is disclosed to police is of no evidentiary significance, per se, since the living witness is an individual human personality whose attributes of will, perception, memory, and volition interact to determine what testimony he will give. The uniqueness of this human process distinguishes the evidentiary character of a witness from *the relative immutability of inanimate evidence.*

*Id.* at 277, 98 S.Ct. 1054 (quoting *Smith v. United States,* 324 F.2d 879, 881–82 (D.C.Cir.1963)). Moreover, the *Ceccolini* Court noted that permanently disabling a witness from testifying carries an "enormous cost" and is traditionally disfavored. *Id.* at 277, 98 S.Ct. 1054 ("Rules which disqualify knowledgeable witnesses from testifying at trial are . . . 'serious obstructions to the ascertainment of truth.' "). Thus, because "the cost of excluding live-witness testimony often will be greater, a closer, more direct link between the illegality and that kind of testimony is required." *Id.* at 278, 98 S.Ct. 1054. Accordingly, courts should be extremely cautious in barring live witness testimony based on the theory that the discovery of the witness was tainted by a prior constitutional violation.

Docket No. 63 at 15–16 (emphasis added).

This argument is misleading if not factually false.

*First.* This proposed extrapolation from the concept of "fruit of the poisonous tree" in effect drops out of significance the phrase "must at least be," which precedes "a 'but for' cause."

*Second.* The proposed extrapolation fails to take account of the fact that the "immutability" of inanimate evidence does not guarantee that the government will discover it in time for use in a reasonably timed trial.

*Third.* This argument misleads by focusing on the connection between wrongful conduct and "discovery of the evidence," without taking account of the nature of the "use" of the discovered evidence.

### 2. Findings of the Court

■ When the factors noted immediately above are taken into account, the passage quoted by the government from *Smith v. United States* weighs more against than for the government's argument that the government should be free to call witnesses in this case because the taint of the government's misconduct in relation to the address book has been attenuated. The quoted passage is directed at expanding the attenuation "doctrine" to allow "inanimate evidence" (such as an address book) because the "relative immutability" of the evidence (the address book) makes it less subject to impairment by government misconduct. The serious problems in this case, however, are less concerned with the address book itself than with the "use" of information the government obtained from it.

Moreover, even as to "inanimate" documents the government seeks to use, the fact that the document itself is immutable does not make it inevitable that the government will become aware of it and get it in time for use during a reasonably timed trial.

Documents showing when the government first became aware of "discovery" and "seizure" of the address book, and documents showing later access to it, are not within the scope of a properly limited "doctrine" of attenuation. Not only was the later usefulness to the government of the address book and information from it "caused" by the government's wrongful

conduct in the "but for" sense, but also the later usefulness was substantial rather than negligible.

The government's argument on "attenuation" misses the mark when suggesting that if the government can show some allegedly "independent source" for its learning about a witness or a document, the government should escape legal accountability for its wrongful seizure of the address book by showing that government agents deliberately put aside the address book and depended more on the allegedly independent source.

A cogent answer to this argument is that not even in relation to civil liability for harm, expressed in a tort judgment for damages, can a wrongdoer, even though only a negligent rather than intentional wrongdoer, escape continuing legal accountability on the ground that another source of contribution to the harm was "more" responsible. Only if evidence makes "it clear that it must be one or the other" of two alleged causes that alone caused the harm, in fact, and makes it clear "that the harm is not due to the combined effects of both," Restatement (Second) of Torts, § 431, comment *b* (1965), does either escape legal accountability merely because of the causal contribution of the other. As the Restatement regarding civil liability for negligent conduct phrases the principle, when two sources contribute to harm, "the question whether the effect was *substantial rather than negligible* becomes important." *Id.* (emphasis added).

I conclude that this question identified in the Restatement regarding tort liability for negligent conduct is even more important in the context of determining whether the effect of the wrongful seizure of the address book was substantial rather than negligible in this prosecution of criminal charges and a factual challenge to the alleged independence of the other allegedly causal source.

The government's argument for applying attenuation in this way and to this extent is a plain effort to excuse the government from ongoing responsibility in the face of the substantial rather than negligible contribution of its wrongful conduct in seizing the address book and maintaining the address book, and the details of information in it, ready for use when needed.

## D. Fallacies in the Government's Argument of Inevitable Discovery

### 1. The Government's Framing of the Argument

In stating its argument on "Inevitable Discovery," in its memorandum in support (Docket No. 63) of its Motion to Allow Witness Testimony (Docket No. 62), the government states its position in the following way:

> Even if evidence, in fact, has been discovered as a result of a constitutional violation, the evidence could nevertheless be admissible if the government can show that the evidence would have been inevitably discovered through lawful means. *Nix v. Williams*, 467 U.S. 431, 444, 104 S.Ct. 2501, 81 L.Ed.2d 377 (1984); *United States v. Bienvenue*, 632 F.2d 910, 913–14 (1st Cir.1980). In order to establish that evidence would have been inevitably discovered, the government must show that: (1) the lawful means of discovery are independent and would necessarily have been employed; (2) discovery by that means is in fact inevitable; and (3) application of the inevitable discovery doctrine will not sully the prophylaxis of the Fourth Amendment. *United States v. Zapata*, 18 F.3d 971, 978 (1st Cir.1994); *United States v. Silvestri*, 787 F.2d 736, 744 (1st Cir.1986). It is not necessary that the lawful means by which the discovery of evidence would have been inevitable be underway or in progress prior to the unconstitutional discovery of the evidence. *United States v. Ford*, 22 F.3d 374, 377 (1st Cir.1994); *Silvestri*, 787 F.2d at 745–46.

Docket No. 63 at 16–17.

### 2. A Matter of Timing

The closing sentence in the quotation of the government's position, immediately

above, is correct in saying that, to invoke the "doctrine" of "inevitable discovery," the government does not need to show "that the lawful means by which the discovery of evidence would have been inevitable" was "underway or in progress" before the unlawful (citing two cases involving. "*unconstitutional* discovery" as the form of unlawfulness) "discovery of the evidence."

■ But in another respect timing is material. That is, if the "inevitable discovery" would not have occurred within time for the government to have the benefit of it at a reasonably timed trial ordered by the trial judge without abuse of discretion, the "doctrine" of "inevitable discovery" cannot be invoked successfully by the government. Even if eventually "inevitable," the discovery of the evidence would not inevitably occur in time for use at the trial.

## VI. Findings Bearing on Use of Particular Witnesses at Trial

### A. Introduction

The government begins its statement of its position on all potential witnesses it has identified in the following way:

II. The Potential Witnesses Were Discovered Through Lawful Means and Should Be Permitted to Testify

As the facts described above reveal, each of the potential witnesses at issue in this motion was discovered by SA Murphy *not as a direct result of the information contained in the address book,* but through independent means. At a minimum, as the numerous investigatory steps employed by SA Murphy in locating these witnesses illustrate, any causal link between the address book and the discovery of the witnesses was so attenuated that the taint arising from the address book was effectively dissipated. Moreover, *the independent sources of information available to SA Murphy made discovery of the witnesses inevitable.* Thus, as set forth

below, their testimony should be admitted.

Docket No. 63 at 17 (emphasis added).

This statement carries forward (1) the overly broad assertion of position of which this opinion takes note at the outset, and (2) the fallacies explained in Part V, immediately above.

The assertion that each and every one of the witnesses the government wishes to use "was discovered by SA Murphy not as a direct result of the information contained in the address book" is not supported by the record. The direct connection between information in the address book and locating and interviewing a witness at the time it occurred was not broken by events independent of the access to the address book. Instead, the intervening events were foreseeable and expectable consequences.

Also, even if we assume in the government's favor that eventual discovery of the witness was inevitable, the timing problem remains. The government needs to show, at least, that discovery in time for use at a reasonably timed trial was inevitable.

■ For the reasons identified in the findings and conclusions I have stated in preceding parts of this opinion and additional findings and conclusions stated in the remaining parts of this opinion, I find that the appropriate order to be made will place limits on the use of witnesses absent a better showing of reason for allowing the proposed use than has been made thus far.

### B. Particular Witnesses

#### 1. Megan Clancy

The government's argument for freedom to use Megan Clancy is as follows:

The facts described above with respect to the discovery of Megan Clancy clearly reveal she was located *through means entirely independent of the discovery of the address book.* SA Murphy located Clancy from information obtained in witness interviews. During his

interview of Eva Argrew, Hughes's grandmother, he learned that Hughes had a girlfriend named Gina Holyoke. Through a record check, he located an address for Holyoke. Holyoke's name and address, which are not in the address book, also came to light when SA Murphy checked subscriber information for a telephone number that appeared frequently on Hughes's Cellular One toll records. When SA Murphy interviewed Holyoke on February 10, 2000, she informed him that Clancy was a friend of Hughes and agreed to arrange an interview with Clancy that same day.

SA Murphy *did not use phone numbers or other information in the address book to contact Clancy. At no time did SA Murphy even use or refer to the address book during his interviews of Argrew, Holyoke, and Clancy.* Under these circumstances, Clancy was *discovered through an independent source, not through the address book. See United States v. Falley,* 489 F.2d 33, 40 (2d Cir.1973) (upholding admission of documents obtained from a broker whose name appeared in an illegally seized address book, when the broker was located through a records search, not through the address book). She should be allowed to testify.

Docket No. 63 at 17–18 (emphasis added).

The underscored passages in the foregoing quotation illustrate again the government's flawed assertions (1) that it did not "use" the address book when it used information obtained from the address book, and (2) that it located Megan Clancy "through means entirely independent of the discovery of the address book." I find that it was "using" the address book when it used information obtained from it, and I find it is misleading to argue that the location of Megan Clancy was independent of the "discovery" of the address book. The relevant focus is the connection between "use" of information from the address book (not "discovery" of the address book) and locating Megan Clancy. *See*

*also* the additional explanation of these findings in Part IV.B of this opinion, above.

The "timing" problem is especially keen in relation to Megan Clancy. Considering all the evidence before me, I find that the government would not have discovered and interviewed Megan Clancy in time for use at a reasonably timed trial had the government not wrongfully seized and used the address book and information from it.

### 2. Heather Caisse

The government's argument for freedom to use Heather Caisse is as follows:

Likewise, Heather Caisse was discovered *through means entirely independent of the address book.* During the interviews of Jason Hughes and Patricia Hughes, those witnesses identified Joe Caisse as someone with whom John Hughes had resided on Garfield Street in Brockton. During her interview, Gina Holyoke also identified Caisse as a friend of Hughes. After SA Murphy unsuccessfully *attempted to contact Joe Caisse through means other than the address book,* he ran a criminal record check on Caisse that revealed that Heather Caisse had taken a restraining order out against Joe Caisse. SA Murphy *then used the address for Heather Caisse on that document to locate her.* At this point, SA Murphy *had stopped referring to the address book because of the ongoing motion to suppress.*

At no time did SA Murphy *use or refer to the address book in his interview with Heather Caisse.* He never called the phone number listed next to "Heather + kids" in the address book and did not know that the entry referred to Heather Caisse prior to his interview with her. Thus, the facts reveal that Heather Caisse, too, was *located by means entirely independent of the address book. See Falley,* 489 F.2d at 40. She should be allowed to testify.

Docket No. 63 at 18–19 (emphasis added).

The emphasized passages in the foregoing quotation provide another illustration

of flaws in the government's assertions (1) that it did not "use" the address book when it used information obtained from the address book, and (2) that it located Heather Caisse "through means entirely independent of the discovery of the address book." I find that the government was "using" the address book when it used information obtained from it, and I find that it is misleading to argue that the location of Heather Caisse was independent of the "discovery" of the address book. The relevant focus, as noted before, is the connection between "use" of information from the address book and locating Heather Caisse in time for government use at a reasonably timed trial.

### 3. LaShaunna Santos

The government's argument for freedom to use LaShaunna Santos is as follows:

The facts also show that LaShaunna Santos was *located through an independent source.* Although the *address book contained an entry with her name, as well as a phone number that traced back to E. Perkins of 52 Lamartine Street in Jamaica Plain,* SA Murphy *did not call either of those numbers* following the seizure of the address book. Rather, in May 2000, after the drug record hearings in which the recovery in Jamaica Plain of a firearm purchased by Hughes had been extensively addressed, SA Murphy reviewed the Cellular One toll records and noticed three phone calls by Hughes to a Jamaica Plain phone number on the day of, and the day after, a different purchase of a firearm by Hughes at Roach's Sporting Goods. Using that phone number, SA Murphy checked subscriber information records and determined that the phone was connected to an apartment at 52 Lamartine Street, in the same housing development at which the firearm recovery had taken place. SA Murphy then proceeded to interview Eva Perkins, the subscriber, who directed her to Bryan Perkins and Shawna Santos as individuals who may

have used the telephone on the relevant days.

At no point did SA Murphy *use the address book, or refer to it, in any of the interviews of these witnesses.* Significantly, SA Murphy contacted Santos not through the phone number listed in the address book, but from the information provided through his interviews of Eva Perkins and Bryan Perkins. He had no knowledge of her relevance to the case until he interviewed Perkins. Thus, SA Murphy located Santos through an independent source. *See Segura,* 468 U.S. at 815, 104 S.Ct. 3380 (holding that evidence is not tainted if constitutional violation was not a "but for" cause for its discovery); *Falley,* 489 F.2d at 40.

Even if this Court were to conclude that there was a causal link between the address book entries for Shawna Santos and for Eva Perkins's phone number, found in June 1999, and the interviews with Perkins and Santos approximately one year later, the link was, at that point, "so attenuated" that the taint was effectively dissipated. *See Crews,* 445 U.S. at 471, 100 S.Ct. 1244. First, *there were numerous "intervening circumstances"* following the seizure of the address book *that were of greater importance* in locating Santos, such that the "taint" from the address book was effectively dissipated. *See id.* When the Cellular One toll records were obtained, they allowed for the phone disc record check conducted by SA Murphy that revealed the name, address, and phone number of Eva Perkins, the same information available through the address book. Moreover, the potential significance of Perkins's address—its location in the same housing development in which one of Hughes's firearms was recovered—only became apparent after the firearm recovery in October 1999. In addition, the fact that actually prompted SA Murphy to contact Perkins was SA Murphy's discovery from the toll records that Hughes had made calls to her Jamaica Plain telephone on the day

of a firearms purchase by Hughes. The decision to interview Santos was based on the information that she might have had access to Perkins's telephone at the time of those calls, not based on the fact that her name was in the address book. Thus, any "taint" from the mere fact that Santos's name appeared in the address book was sufficiently attenuated by these numerous intervening factors. Because Santos's testimony "has been come at by . . . means sufficiently distinguishable to be purged of the primary taint," it should be admitted. *See Wong Sun,* 371 U.S. at 487–88, 83 S.Ct. 407.

Moreover, the *degree of attenuation is further illustrated by the fact that there was a significant time gap between the discovery of the address book and the attempts to interview Perkins* and Santos, the fact that Perkins and Santos willingly spoke to SA Murphy when he first approached them, and the fact that SA Murphy did not use or refer to the address book in his interviews. *See Ceccolini,* 435 U.S. at 279, 98 S.Ct. 1054 (identifying factors that show attenuation that dissipates taint of constitutional violation on testimony of a live witness); *United States v. McKinnon,* 92 F.3d 244, 247–48 (4th Cir.1996) (upholding under attenuation doctrine the testimony of a witness located as result of unlawful interrogation of defendant based on the witness's willingness to speak to law enforcement and lack of use of any illegally seized evidence during the interview); *see also United States v. Miller,* 666 F.2d 991, 996 (5th Cir.1982) (holding that witnesses found as a result of information in an illegally seized diary would be permitted to testify in part because they were willing to testify without knowing that the investigators had the diary and had located them through the diary). *Where SA Murphy had access* to the contact information for Perkins *through a source other than the address book*—the toll records and subscriber records—the *significant social costs resulting from a complete bar to testimony by a witness outweigh the deterrent effect arising from exclusion of Santos's testimony. See Miller,* 666 F.2d at 996. Thus, even if there was a causal link *between the address book and the discovery of Santos,* the link was so attenuated from the discovery of the address book that the taint was dissipated. *See id.* Santos should be permitted to testify.

Docket No. 63 at 19–22 (emphasis added).

The emphasized passages in the foregoing quotation illustrate again the government's flawed assertions (1) that it did not "use" the address book when it used information obtained from the address book, and (2) that it located LaShaunna Santos "through means entirely independent of the discovery of the address book." I find that it was "using" the address book when it used information obtained from it, and I find it is misleading to argue that the location of LaShaunna Santos was independent of the "discovery" of the address book. The relevant focus is the connection between "use" of information from the address book (not "discovery" of the address book) and locating LaShaunna Santos. *See also* Part IV.B of this opinion, above.

Also, the argument that "numerous 'intervening circumstances' following the seizure of the address book . . . were of greater importance" is inconsistent with ongoing legal accountability of the government as one of multiple contributors to ongoing harmful consequences. *See* Part V.C. of this opinion, above.

I find, nevertheless, that the government more probably than not would have located LaShaunna Santos, even without having the use of the address book and its contents, in time for use at a reasonably timed trial. The preclusion order to be issued will not preclude government use of this witness for purposes other than introducing the address book or the fact of its containing information that is in fact in it.

#### 4. Frank Calisi

The government's argument for freedom to use Frank Calisi is as follows:

SA Murphy's decision to interview Frank Calisi was the result of investigation *almost entirely unrelated to the address book.* Shortly after the hearings on the government's Motion for Disclosure of Drug Treatment Records, SA Murphy ran a record check to identify residents of 52 White Street in East Boston, the address given by Hughes on his Cellular One application which SA Murphy knew to be a drug rehabilitation facility. Among the individuals using that address in late 1998, the same time frame as Hughes, was Frank Calisi. SA Murphy determined that Hughes must have known Calisi because in addition to the shared address during that time period, the toll records and subscriber information revealed that Hughes had made at least one telephone call from his cellular phone to a business known as Calisi's Flowerland. SA Murphy then ran record checks in order to obtain information with which to contact Calisi. He did not use the phone number in the address book to find Calisi. *The only link between the address book and the decision to interview Calisi was the fact that when SA Murphy pulled up Calisi's name as a resident of 52 White Street, he also recalled that Calisi's name appeared in the address book.* Because SA Murphy had another means by which he had linked Calisi to Hughes, namely the toll records and subscriber information, *the seizure of the address book was not a "but for" cause of SA Murphy's contact with Calisi. See Segura v. United States,* 468 U.S. 796, 815, 104 S.Ct. 3380, 82 L.Ed.2d 599 (1984). Thus, he was located through independent sources, not tainted evidence.

Even if SA Murphy's recollection that Calisi's name appeared in the address book is deemed to be a causal link to the contact with Calisi, *that connection is so attenuated that the taint arising from*

*the link is clearly dissipated. See Crews,* 445 U.S. at 471, 100 S.Ct. 1244. As with Santos, *there were numerous "intervening circumstances"* following the seizure of the address book *that were of greater importance* in identifying Calisi as a potential witness: the Cellular One records showing that Hughes resided at 52 White Street, the toll record showing a call from Hughes to Calisi's Flowerland, the interviews revealing Hughes's drug problem, and the records checks revealing Calisi's residence at 52 White Street. Indeed, the potential significance of Calisi only came about from these record checks, not from the mere fact that Calisi's name was in the address book.

The degree of attenuation is further illustrated by the facts that *SA Murphy did not attempt to contact Calisi until almost a year after the discovery of the address book, that he did not use or refer to the address book in his interview with Calisi,* and that Calisi willingly spoke to SA Murphy shortly after he was initially contacted. *See Ceccolini,* 435 U.S. at 279, 98 S.Ct. 1054 (identifying factors that show attenuation that dissipates taint of constitutional violation on testimony of a live witness); *McKinnon,* 92 F.3d at 247–48; *Miller,* 666 F.2d at 996. Particularly when SA Murphy had an independent basis for connecting Calisi to Hughes—the records showing Calisi's residence at 52 White Street at the same time as Hughes, and the toll record and subscriber record showing a call from Hughes to Calisi's Flowerland—any taint arising from the presence of Calisi's name in the address book was amply dissipated. *See Miller,* 666 F.2d at 996. Because Calisi's testimony "has been come at by ... means sufficiently distinguishable to be purged of the primary taint," *Wong Sun,* 371 U.S. at 487–88, 83 S.Ct. 407, Calisi should be allowed to testify.

In the alternative, even if this Court were to conclude that SA Murphy's rec-

ollection that Calisi's name was in the address book was the fact that prompted SA Murphy's decision to interview Calisi, *Calisi should still be permitted to testify under the inevitable discovery doctrine. See Nix,* 467 U.S. at 444, 104 S.Ct.·2501; *United States v. Bienvenue,* 632 F.2d 910, 913–14 (1st Cir.1980). Even absent the address book, SA Murphy was aware from record checks that Calisi was a resident of 52 White Street around the time of Hughes's residency at that facility. *The only information provided by the address book, the inference that Hughes knew Calisi, was also available to SA Murphy from independent sources*—the toll records and subscriber information indicating that Hughes had made at least one call to a business named Calisi's Flowerland, from which SA Murphy logically concluded had some connection to Calisi. "Where the police have access to two sources containing the same information, and one is tainted while the other is lawful, it would be absurd for this court not to find that the testimony produced at trial, which stemmed indirectly from the tainted source, was inevitably discoverable apart from reliance on the unlawful source." *Miller,* 666 F.2d at 997.

From these facts, SA Murphy should have inferred (and did infer) that Calisi and Hughes knew each other from the drug rehabilitation facility. Thus, it was inevitable that even without the address book, SA Murphy would have conducted the further record checks that he did, in fact, complete in order to obtain contact information for Calisi. *See Bienvenue,* 632 F.2d at 913–14 (holding that although agents unlawfully seized travel documents that led to information held by travel agencies, the information would have inevitably been discovered because the agents were aware that the defendant had dealt with local travel agencies and had canvassed all agencies in the area for information on the defendant); *United States v. Procopio,* 88 F.3d 21, 27 (1st Cir.1996). Accordingly, Calisi should be allowed to testify.

Docket No. 63 at 22–25 (footnote omitted) (emphasis added).

The emphasized passages in the foregoing quotation illustrate again the government's flawed assertions (1) that it did not "use" the address book when it used information obtained from the address book, and (2) that it located Frank Calisi "through means entirely independent of the discovery of the address book." I find that it was "using" the address book when it used information obtained from it, and I find that it is misleading to argue that the location of Frank Calisi was independent of the "discovery" of the address book.

In this instance, however, as I have done as to LaShaunna Santos, I find, nevertheless, that the government more probably than not would have located Frank Calisi, even without having the use of the address book and its contents, in time for use at a reasonably timed trial. The preclusion order to be issued will not preclude government use of this witness for purposes other than introducing the address book or the fact of its containing information that is in fact in it.

## ORDER

For the foregoing reasons, it is ORDERED:

(1) Absent a showing of good cause in law and fact to support the government's request, the government is hereby precluded from using during its case-in-chief at trial:

(a) the address book or any information obtained by "use" of information obtained from the address book as the meaning of the term "use" is explained in the foregoing opinion of this court;

(b) any of the witnesses Megan Clancy, Heather Caisse, LaShaunna Santos, and Frank Calisi for the purpose of introducing into evidence the ad-

dress book or the fact of its containing information that is in fact in it;

(c) Megan Clancy or Heather Caisse for any other purpose.

(2) The court will hear oral argument on Defendant's Motion for Order to Accompany Trial Subpoenas (Docket No. 81) at the next Case Management Conference in this case.